IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

RECORDED BOOKS, LLC,

                Plaintiff,

          v.

OCLC ONLINE COMPUTER LIBRARY
CENTER, INC. d/b/a NETLIBRARY,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No. 8:07-cv-01427-DKC

**MEMORANDUM IN SUPPORT OF PLAINTIFF RECORDED BOOKS, LLC'S
MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................1

FACTUAL BACKGROUND ................................................................................2

I.      Background of Recorded Books ..............................................................2

II.     Recorded Books' Agreement with NetLibrary .......................................3

III.    NetLibrary Violated the Exclusivity Provision
        of the Agreement.....................................................................................5

IV.     NetLibrary Violated Other Material Provisions of the
        Agreement................................................................................................8

V.      Recorded Books Exercised its Right to Terminate the
        Agreement..............................................................................................11

VI.     NetLibrary Continues to Unlawfully Sell New
        Subscriptions Under the Agreement .....................................................12

VII.    The Parties Bargained for Injunctive Relief as the
        Primary Remedy for Breaches of the Agreement .................................13

ARGUMENT .....................................................................................................14

I.      Recorded Books Is Likely to Succeed on the Merits
        of its Claims..........................................................................................15

        A.      Recorded Books Is Likely to Succeed on the
                Merits of its Claim for Copyright
                Infringement...............................................................................15

                1.      Recorded Books Owns Valid Copyrights in
                        the Sound Recordings of its Audiobooks.........................15

                2.      NetLibrary Is Violating Recorded Books'
                        Exclusive Rights in its Copyrighted
                        Audiobooks .......................................................................16

                3.      NetLibrary Is Not Licensed to Distribute
                        Recorded Books' Audiobooks Because the
                        Agreement Was Terminated ..............................................16

a.    NetLibrary Triggered Recorded Books'
Right to Immediately Terminate the
Agreement by Violating the Agreement's
Exclusivity Provision.........................................................17

i.    NetLibrary's Subscription Service with
the Bibliographic Center for Research
("BCR") Violates the Exclusivity
Provision ...............................................................18

ii.    NetLibrary's Subscription Service with
SOLINET Violates the Exclusivity
Provision ...............................................................19

iii.    NetLibrary's Marketing, Sale, and
Distribution of Non-Recorded Books
Audiobooks Via the Internet Violates
the Exclusivity Provision ......................................19

b.    Net Library Triggered Recorded Books' Right
to Terminate the Agreement by Failing to
Meet Technical and Customer Service
Standards...........................................................................20

B.    Recorded Books Is Likely to Succeed on the Merits of
its False Advertising Claim............................................................21

C.    Recorded Books is Likely to Succeed on the Merits of
its Claim for Ongoing Breach of the Agreement...........................22

II.    Recorded Books Faces Irreparable Harm if the Injunction Is Denied..................23

III.    Enjoining the Misuse of Recorded Books' Audiobooks Will Result
in No Cognizable Harm to NetLibrary .................................................................24

IV.    The Public's Interest Will Be Served by Halting NetLibrary's
Ongoing Copyright Infringment, False Advertising, and Breach of
the Agreement.......................................................................................................25

CONCLUSION...............................................................................................................26

Plaintiff Recorded Books, LLC ("Recorded Books") hereby submits this memorandum in support of its motion for entry of a preliminary injunction against defendant OCLC Online Computer Library Center, Inc. d/b/a NetLibrary ("NetLibrary").

## INTRODUCTION

Recorded Books is the world's largest independent producer of recorded audiobooks, and is the owner of copyrights in the sound recordings of the audiobooks it produces. In 2004, Recorded Books entered into an eContent Production and Distribution Agreement (the "Agreement") with NetLibrary for the marketing and distribution of Recorded Books' audiobooks over the Internet through a subscription service to libraries. Under the Agreement, the subscription service with Recorded Books was the <u>exclusive</u> means by which NetLibrary could distribute <u>any</u> audiobooks to libraries via the Internet, and NetLibrary agreed that if it offered audiobooks through any other sales models, Recorded Books could immediately terminate the Agreement. Notwithstanding this exclusivity provision, in 2007 NetLibrary began selling non-Recorded Books audiobooks over the Internet and offering libraries Internet-based audiobook subscriptions for non-Recorded Books titles.

Moreover, NetLibrary's performance of its Internet-based delivery system and its customer service obligations failed to meet the performance requirements under the Agreement from nearly the beginning of the relationship. These performance failures by NetLibrary led to significant customer complaints that have tarnished Recorded Books' image among libraries and the public. Despite notice from Recorded Books concerning the problems with NetLibrary's technical and customer service performance, NetLibrary failed to correct these deficiencies.

As a result of NetLibrary's breach of the exclusivity provision and its ongoing performance failures, Recorded Books terminated the Agreement by letter dated April 20, 2007. In order to honor its commitments to existing customers and comply with the Agreement's wind-

down provisions, Recorded Books continues to deliver new content to NetLibrary, in the form of copyrighted audiobooks, to provide to existing subscribers through the end of their current subscriptions. NetLibrary, however, is <u>not licensed or authorized</u> to renew subscriptions or to sell new subscriptions to libraries after May 31, 2007.

Despite Recorded Books' termination of the Agreement, NetLibrary continues to distribute Recorded Books' audiobooks to new or renewed subscribers, and continues to advertise that it will do so on its website. Those actions infringe Recorded Books' exclusive rights under the Copyright Act, violate the Agreement, and constitute false advertising under the Lanham Act. NetLibrary should therefore be enjoined.

## FACTUAL BACKGROUND

### I.     Background of Recorded Books

Founded in 1979 by Henry Trentman—who, while searching for an alternative to standard radio programming to fill his hours on the road, came up with the idea of listening to recordings of all the great books he could not find time to read—Recorded Books has grown to become the world's largest independent publisher and distributor of unabridged audiobooks. Declaration of Brian T. Downing in Support of Plaintiff Recorded Books, LLC's Motion for Preliminary Injunction, dated June 19, 2007 ("Downing Dec.") ¶ 2. Over the last several decades, Recorded Books has distributed its audiobooks to consumers, libraries, and schools throughout the United States primarily on cassettes and compact discs. *Id.* ¶ 3.

Today, Recorded Books offers more than 7,000 audiobook titles. It is the trusted publisher of Stephen King, James Patterson, David Baldacci, Jimmy Carter, and Stephen Breyer, among many others. *Id.* ¶ 4.

Recorded Books owns federally-registered copyrights for the sound recordings of nearly all of these works. *Id.* ¶ 5. Recorded Books derives almost all of its revenue from the sale,

licensing, and distribution of its copyrighted audiobooks. *Id.* ¶ 6. In 2006 alone, Recorded

Books' revenue from the distribution of audiobooks and related materials exceeded $80 million.

*Id.*

## II.     Recorded Books' Agreement with NetLibrary

In an effort to expand its audiobook offerings beyond cassettes and CDs into electronic

formats that can be downloaded from the Internet, Recorded Books in September 2004 entered

into the Agreement with NetLibrary. *Id.* ¶ 7 and Exhibit A (hereinafter cited as "Agreement").

The Agreement granted NetLibrary the worldwide right and license to distribute downloadable

electronic copies of certain of Recorded Books' audiobook titles via an Internet-based

subscription service for libraries. Agreement, §§ 1, 3; Downing Dec. ¶ 8. The Agreement

allowed public, school, university, and military libraries ("Subscribing Libraries" or

"Recipients") to purchase, for a fixed fee that was determined based on the library's total

circulation or population served, a subscription to a "Bundled Collection" of Recorded Books'

audiobook titles. Agreement, Exhibit C, § 2; Downing Dec. ¶ 9.

In turn, the Subscribing Libraries' patrons were permitted to select and download to their

computer or personal listening device electronic copies of the titles contained in the Bundled

Collection. The Agreement imposed a cap on the total number of downloads, or "Checkouts,"

that the Subscribing Libraries' patrons could make during the term of the subscription.

Agreement, Exhibit C, § 2; Downing Dec. ¶ 10. Recorded Books and NetLibrary agreed to share

the revenues from the sale of subscriptions according to a formula set forth in the Agreement.

Agreement, Exhibit C, § 2; Downing Dec. ¶ 11.

Under the Agreement, Recorded Books was required on a periodic basis to provide

NetLibrary with content, in the form of electronic copies of its audiobook titles, to NetLibrary to

be added to the Bundled Collection. Agreement, Exhibit C, § 4; Downing Dec. ¶ 12.

3

NetLibrary, in turn, was required to host and provide the technical and customer support for the Internet-based subscription service on a Recorded Books/NetLibrary co-branded website. Agreement, § 1(c), and Exhibit B; Downing Dec. ¶ 13.

One of the key terms of the Agreement provided that the Internet-based subscription service described in the Agreement would be the <u>exclusive</u> means by which either party would distribute electronic copies of audiobooks over the Internet. In particular, § 1(a) of Exhibit C to the Agreement (the "Exclusivity Provision") provided as follows:

> The Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet. The Subscription sales model described in this Agreement is the exclusive means by which Recorded Books will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet.

Agreement, Exhibit C, § 1(a); Downing Dec. ¶ 14.

The Exclusivity Provision also provided that if NetLibrary were to enter into an agreement to provide audiobook content via a subscription service to which Recorded Books was not a party, Recorded Books would have the immediate right to terminate the Agreement:

> netLibrary and Recorded Books will allow other content providers to contribute content and to participate in this Subscription sales model on equivalent terms. <u>If, without Recorded Books' consent, netLibrary signs an Agreement to allow another content provider to contribute Audio Book content and to participate in a Subscription sales model to which Recorded Books is not a party; then</u>, subject to Section 1.(e) of Exhibit B, <u>Recorded Books may give netLibrary written notice terminating this Agreement immediately.</u>

Agreement, Exhibit C, § 1(a) (emphasis added); Downing Dec. ¶ 15.

The Agreement also included a number of specific terms relating to NetLibrary's obligation to host and support the Internet-based subscription service. In particular, Exhibit B

4

and Schedule B-1 to the Agreement imposed technical and customer service requirements for the

services that NetLibrary was to provide under the Agreement.  Agreement, Exhibit B and

Schedule B-1; Downing Dec. ¶¶ 16-24.

In addition to Recorded Books' right immediately to terminate the Agreement based on

NetLibrary's violation of the Exclusivity Provision, the Agreement also provided that if

NetLibrary committed other material breaches of the Agreement, then Recorded Books "may

terminate this Agreement at any time after providing the other party with 60 days' prior written

notice of the occurrence of … [the] violat[ion] [of] any material provision of this Agreement or

… breaches of this Agreement that, in the aggregate, are material."  Agreement, § 4(b); Downing

Dec. ¶ 25.

Finally, in the event of termination, § 1(e)(iii) of Exhibit B to the Agreement provided in

relevant part:

> netLibrary will on the effective date of termination <u>cease selling
> and marketing Subscriptions</u> to the Bundled Collection(s) but
> netLibrary may continue to host and distribute copies of NL
> Electronic Versions of Audio Books contained in the Bundled
> Collection(s) to Recipients with Subscription Terms that expire
> after the Termination of the Agreement if netLibrary gives
> Recorded Books written notice of the identity of these Recipients.
>
> * * * *

Agreement, Exhibit B, § 1(e)(iii); Downing Dec. ¶ 26.

## III.    NetLibrary Violated the Exclusivity Provision of the Agreement.

Although prohibited by the unambiguous Exclusivity Provision in the Agreement,

NetLibrary has entered into one or more agreements with other content providers that allow

those providers to contribute audiobook content and to participate in Internet-based subscription

services with NetLibrary.  Downing Dec. ¶ 27.  Recorded Books is not a party to these

agreements, nor has it consented to NetLibrary entering into them.  *Id.*

In particular, in conjunction with the Bibliographical Center for Research ("BCR"), NetLibrary is now offering an Internet-based audiobook subscription service to BCR's member libraries that competes directly with the Recorded Books/NetLibrary Internet-based subscription service covered by the Agreement. *Id.* ¶ 28. As described in BCR's promotional materials appearing on its website:

> The BCR Shared eAudiobook Collection includes 200 titles from publishers such as Random House, Books on Tape, Listen and Live, Listening Library and Blackstone Audio. Among the mixture of fiction, non-fiction and some children's titles you'll find titles from best-selling authors such as Robert B. Parker, Sue Grafton, Jonathan Kellerman, Alice Munro and Dean R. Koontz. The collection includes "My Life in France" by Julia Child and "Life After Death: The Burden of Proof" by Deepak Chopra and as well [sic] as two titles from the popular "Artemis Fowl" series.

*Id.* ¶ 29 and Exhibit B.

Just like the Recorded Books/NetLibrary subscription service, the BCR/NetLibrary subscription service allows patrons of BCR's member libraries to access and download selections from an initial bundled collection of audiobook works from a variety of publishers, and "new content or additional titles will be added to the collection on a regular basis (bi-annually)." *Id.* ¶ 30 and Exhibit B. In addition, just like the Recorded Books/NetLibrary subscription service, the BCR/NetLibrary subscription service requires the subscribing libraries to "pay fees annually to participate in the BCR Shared eAudiobooks Collection." *Id.* ¶ 31 and Exhibit B.

There is no question that the BCR/NetLibrary subscription service is a "Subscription sales model" that violates the Exclusivity Provision of the Agreement. *Id.* ¶ 32. NetLibrary requires libraries that participate in the BCR/NetLibrary subscription service to enter into a "Consortium Agreement for Audio Book Purchases – Library Audio Book Agreement." *Id.* ¶ 32

and Exhibit C. The form of this agreement that can be downloaded from the BCR website requires participating libraries to enter a "Subscriber Name" into the agreement. *Id.*

NetLibrary also has established a relationship with SOLINET (formally known as the Southeastern Library Network) to provide an Internet-based subscription service to SOLINET's member libraries. *Id.* ¶ 33. Just like the Recorded Books/NetLibrary subscription service (as well as the BCR/NetLibrary subscription service), SOLINET and NetLibrary offer a subscription service to member libraries that allows their patrons to access and download works from a bundled collection of audiobooks—<u>except</u> that they are from non-Recorded Books publishers. *Id.* ¶ 34. As stated on the SOLINET website, "[u]nlike the shared eBook collections, <u>the shared eAudiobook collection is a subscription</u>. Member funds will be pooled and titles for the collection will be selected from the approximately 2,100 currently available NetLibrary eAudiobooks from Blackstone, Random House, Listen and Live and others." *Id.* ¶ 35 and Exhibit D (emphasis added).

NetLibrary's own press releases and website make clear that NetLibrary is violating the Agreement's requirement that "[t]he Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet." Agreement, Exhibit C, § 1(a).[1]

For example, on February 12, 2007, NetLibrary issued a press release announcing that it had "launched a new purchase model for its growing collection of eAudiobooks." Downing Dec. ¶ 37 and Exhibit E. According to the press release, "[l]ibrarians now have the option to add individual titles to their collections from leading publishers including Random House,

---

[1] "Recipients" are defined in the Agreement as "a public, school, or university library; military base; or any library associated with these institutions." Agreement, § 2(a)(x).

Blackstone Audio, and many more to come." *Id.* In other words, in direct contravention of the Exclusivity Provision, NetLibrary is currently "market[ing], distribut[ing] and sell[ing] to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet" other than through "[t]he Subscription sales model described in th[e] Agreement." Agreement, Exhibit C, § 1(a).[2]

NetLibrary has also intermingled on its website audiobook works available under the Recorded Books/NetLibrary subscription service with audiobook works available under other subscription services, giving the false impression to patrons of Subscribing Libraries that they are able to access a wider variety of works than they really are. Downing Dec. ¶ 39 and Exhibit F. NetLibrary's practice of intermingling works available under competing subscription services has already caused dissatisfaction, and is expected to cause significant additional dissatisfaction, among patrons of Subscribing Libraries who see references to non-Recorded Books audiobooks that they are not able to download. *Id.* ¶ 40 and Exhibit F.

**IV.    NetLibrary Violated Other Material Provisions of the Agreement.**

In addition to violating the Exclusivity Provision, NetLibrary has consistently failed to live up to its technical and customer service responsibilities under the Agreement. *Id.* ¶ 41. NetLibrary's failures have resulted in a near-endless stream of customer complaints, most of which have yet to be remedied. *Id.*

For example, NetLibrary has repeatedly failed to appropriately index and/or allow Subscribing Libraries access to selected titles reliably or with reasonable stability. *Id.* ¶ 42.

---

[2]    Although NetLibrary refers to some of its competing products as fitting within a "purchase model"—no doubt in a strategic effort to circumvent the Exclusivity Provision—the reality is that many of them, especially the BCR and SOLINET products, mirror the Recorded Books/NetLibrary subscription service. In any event, regardless of the term NetLibrary uses to describe its various services, it is plain that it is distributing electronic audiobooks via the Internet other than through the Recorded Books/NetLibrary subscription service covered by the Agreement. *See* Agreement, Exhibit C, § 1(a).

8

Complaints regarding these failures have been received from libraries in Thompson, Connecticut; Scoville, Connecticut; Seneca Falls, New York; Avon Lake, Ohio; the State of Wyoming; CLAMS (Cape Libraries Automated Materials Sharing) Consortia; as well as from a number of individual library patron customers. *Id.* Recorded Books first notified NetLibrary in writing of these deficiencies in November of 2006, but the causes of these failures have not been corrected, and complaints were still being received as recently as March of 2007. *Id.*

NetLibrary has also repeatedly failed to make MARC records[3]—both initial batches and monthly updates—available to Subscribing Libraries and their patrons for downloading reliably or with reasonable stability in a timely fashion. *Id.* ¶ 43. Complaints have been received from libraries in Mohawk Valley, New York; Fulton County and Atlanta, Georgia; Capital Area, Pennsylvania; Morris County, New Jersey; Henderson, Kentucky; Beamis, Colorado; Jackson County, Indiana; and CLAMS Consortia. *Id.* Recorded Books notified NetLibrary in writing by e-mail of these deficiencies in December of 2006, but NetLibrary has failed to implement a system that achieves stable delivery, and complaints were still being received as recently as April of 2007. *Id.*

NetLibrary has also failed to implement a streamlined authentication process in response to complaints from library subscribers. *Id.* ¶ 44. Moreover, in the course of attempting to address this issue, NetLibrary caused a week-long shutdown of the system in the Iowa City Public Library in January of 2007 that resulted in specific complaints of sub-par customer support. *Id.* This became well-known among library patrons in Iowa and damaged Recorded Books' reputation and business prospects. *Id.*

---

[3]    MARC records refer to "<u>MA</u>chine-<u>R</u>eadable <u>C</u>ataloging records."

NetLibrary has also failed to address customer concerns and complaints regarding the size of the files transmitted, which results in inadequate bookmarking, and failure of compatibility with otherwise suitable players. *Id.* ¶ 45. Recorded Books specifically notified NetLibrary of the need to address these issues during meetings on February 8, 2006, and conveyed the importance of these issues at that time. NetLibrary has failed to correct these problems. *Id.*

NetLibrary has also failed to implement a Digital Rights Management system that restricts a "Checkout" period (i.e., the period of time during which a patron has access to the copyrighted audiobook file) for a patron to twenty-one days in violation of Sections 1(a)(i), 4(a)(i), and 4(b)(ii) of Schedule B-1 of the Agreement. *Id.* ¶ 46. A restricted Checkout period is crucial for protecting the value of Recorded Books' copyrights under the licensing structure set forth in the Agreement. *Id.* Without restrictions on the Checkout period, instead of lending Recorded Books' copyrighted audiobooks for a limited time period, Subscribing Libraries are permitted to give away an unlimited number of perpetual copies of Recorded Books' copyrighted sound recordings. *Id.* NetLibrary has been aware of this failure since soon after the effective date of the Agreement, but has not provided any practical technical method for restricting the Checkout period. *Id.*

The consistent failure of NetLibrary to fulfill the technical and customer service requirements of the Agreement has resulted in ongoing customer complaints and subscriber dissatisfaction with the Recorded Books/NetLibrary subscription service. *Id.* ¶ 47. This dissatisfaction has had a substantial adverse effect on Recorded Books' reputation in the marketplace that is impossible to quantify. *Id.*

10

One example of the damaging effect of NetLibrary's inability to live up to its technical and customer service obligations can be found on the Baltimore County Public Library website, which states: "There is currently a problem with downloading the license necessary to play Recorded Books/NetLibrary audio books.  Technical support staff are working to resolve this issue.  The problems seem to occur when customers are using Firefox or Internet Explorer 7.  Netscape and earlier versions of Internet Explorer appear to work as expected.  Technical support staff are working to resolve this issue.  You may experience trouble, particularly in acquiring a license to play the file you have downloaded." *Id.* ¶ 48 and Exhibit G.  For patrons who are unable to resolve this technical problem, the Baltimore County Public Library suggests that they "consider our other downloadable audio book option – OverDrive." *Id.* ¶ 49 and Exhibit G.  In short, NetLibrary's failures are resulting in Recorded Books' Subscribing Libraries referring their patrons to one of Recorded Books' direct competitors. *Id.* ¶ 50.  Unfortunately, Recorded Books found out about this problem through its own Internet search.  Unless specifically brought to its attention by a Subscribing Library, Recorded Books has no way of determining the extent to which this type of problem is happening. *Id.*

**V.    Recorded Books Exercised its Right to Terminate the Agreement.**

On April 20, 2007, primarily due to NetLibrary's violation of the Exclusivity Provision (which allows for immediate termination), but also due to its other material breaches (for which Recorded Books had provided more than sixty days' notice), Recorded Books sent NetLibrary notice that it was exercising its right to terminate the Agreement. *Id.* ¶ 51 and Exhibit H.

NetLibrary responded to Recorded Books' termination letter on April 30, 2007.  Although NetLibrary's twelve single-spaced-page response attempted to justify NetLibrary's failures in living up to its technical and service requirements, nowhere did NetLibrary offer any

11

facts to support its claim that it had not entered into "an Agreement to allow another content provider to contribute eAudioBook content and to participate in a Subscription sales model to which Recorded Books is not a party." *Id.* ¶ 52 and Exhibit I. Rather, NetLibrary stated that "[a]ny actions that NetLibrary has taken to pursue alternate business models" with respect to audiobook content providers other than Recorded Books were justified. *Id.* ¶ 53 and Exhibit I. In addition, even though Recorded Books has terminated the Agreement, NetLibrary stated in its letter that it "will continue to accept orders from Libraries for the purchase of eAudioBook Subscriptions." *Id.* ¶ 54 and Exhibit I.

## VI.    NetLibrary Continues to Unlawfully Sell New Subscriptions Under the Agreement.

In accordance with § 1(e)(iii) of Exhibit B to the Agreement, Recorded Books has informed NetLibrary that it will continue to fulfill its obligations with respect to those NetLibrary subscriptions that were in effect on or before May 31, 2007, but has informed NetLibrary that NetLibrary is not licensed to enter into any new agreements or to renew existing agreements with Subscribing Libraries to provide content from Recorded Books after May 31, 2007. *Id.* ¶ 55.[4] In addition, Recorded Books continues to provide new content to NetLibrary so that NetLibrary may in turn provide it to Subscribing Libraries that have unexpired subscriptions that were commenced on or before May 31, 2007. *Id.* ¶ 56.

Despite Recorded Books' instruction to NetLibrary to no longer sell or renew subscriptions after May 31, 2007, NetLibrary has continued to do so. *Id.* ¶ 57 and Exhibit K. In fact, NetLibrary recently sent an e-mail to the Subscribing Libraries that stated:

\* \* \* \*

---

[4]    Recorded Books originally sent an e-mail to the Subscribing Libraries on May 4, 2007 stating that Recorded Books had terminated its relationship with NetLibrary and that subscriptions for the Recorded Books/NetLibrary service would need to be renewed by May 18, 2007. In response to requests from Subscribing Libraries, Recorded Books extended the cut off date for new subscriptions and renewals to May 31, 2007. Downing Dec. ¶ 55 and Exhibit J.

Because of the number of eAudiobook Subscriptions that libraries
have purchased, Recorded Books and OCLC NetLibrary have
satisfied a revenue milestone that automatically extends our
agreement from 2007 until 2010.

\* \* \* \*

Unfortunately, we understand that the Recorded Books sales force
has informally told many libraries that Recorded Books has
terminated its agreement with OCLC. This is incorrect. We also
understand that many libraries were sent an e-mail from Recorded
Books management last week stating that all upcoming
eAudiobook renewals must be completed by May 18, 2007.
Again, this message is incorrect. Recorded Books does not have
the right to immediately terminate the agreement, and has not
satisfied the agreement's provisions for termination.
Consequently, there is no need to accelerate the timing of your
subscription renewal.

You will not experience any change in your eAudiobook
Subscription as a result of the recent communication from
Recorded Books. You will receive access to Recorded Books
eAudiobooks for the full term of your eAudiobook Subscription.
You may renew your eAudiobook Subscription at your
convenience at any time prior to its expiration. You will continue
to receive new eAudiobook content as Recorded Books delivers it
to NetLibrary.

*Id.* ¶ 58 and Exhibit L.

## VII.    The Parties Bargained for Injunctive Relief as the Primary Remedy for Breaches of the Agreement.

The Agreement provides that in the event of a breach by either party, the "non-breaching

party may seek injunctive relief in any court of competent jurisdiction to enjoin or restrain the

breaching party from continuing to do any act or commit any violation or threatened breach of a

material provision of this Agreement." Agreement, § 8.

That injunctive remedies are the primary forward-looking means of redress that the

parties agreed to for breaches of the Agreement is apparent from the limitations that the parties

set on other remedies. In the same section that provides for broad injunctive relief, the

Agreement strictly limits the availability of damages to (i) claims for amounts due, (ii) claims for breaches of party's representation and warranties, or (iii) claims for indemnification.  *Id.*[5]

## **ARGUMENT**

Recorded Books seeks a preliminary injunction to prevent NetLibrary from (i) infringing Recorded Books' exclusive rights under the Copyright Act in its copyrighted sound recordings; (ii) tarnishing Recorded Books' reputation among libraries and the reading public by falsely advertising that NetLibrary is authorized to provide Recorded Books' audiobooks to new subscribers; and (iii) violating the Agreement.

The Fourth Circuit has set forth the following balancing test for courts to consider when deciding a motion for a preliminary injunction:

(1)     the plaintiff's likelihood of success on the merits of the underlying dispute;

(2)     the possibility of irreparable harm to the plaintiff if preliminary relief is denied;

(3)     the harm to the defendant if an injunction is issued; and

(4)     the public interest.

*Advance Magazine Publishers Inc. v. Leach*, 466 F. Supp. 2d 628, 638 (D. Md. 2006) (Chasanow, J.) (citing *Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 196 (4th Cir. 1977)).  Here, the factors tip decidedly in favor of granting injunctive relief.

---

[5]     In addition to providing for injunctive relief for "any violation or threatened breach of a material provision of [the] Agreement," the Agreement's "Limitation on Damages" clause provides that:  "Neither party will claim special, incidental, indirect, or consequential damages, including lost profits, (whether arising under tort, contract or any other legal theory, and regardless of whether a party foresaw such damages) for breach of this Agreement.  Except for a breach of a party's representations and warranties, remedies will be limited to claims for amounts due, for injunctive relief as provided under this Section 8, or for indemnification as provided for under Section 7."  Agreement, § 8.

I.      **Recorded Books Is Likely to Succeed on the Merits of its Claims.**

      A.      **Recorded Books Is Likely to Succeed on the Merits of its Claim for Copyright Infringement.**

NetLibrary's distribution of Recorded Books' copyrighted sound recordings constitutes infringement of the exclusive rights afforded to copyright owners under 17 U.S.C. § 106, and should be enjoined pursuant to 17 U.S.C. § 502.

The Copyright Act provides that "[a]nyone who violates any of the exclusive rights of the copyright owner … is an infringer of the copyright." 17 U.S.C. § 501. "Stated at a general level, '[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Advance Magazine Publishers*, 466 F. Supp. 2d at 634 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). More specifically, the "copying" element in the formulation above is shorthand for any "trespass[] into the copyright owner's exclusive domain established in § 106." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549 (4th Cir. 2004) (quoting *Sony Corp. v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984)) (internal quotations omitted).

      1.      **Recorded Books Owns Valid Copyrights in the Sound Recordings of its Audiobooks.**

Recorded Books has provided NetLibrary with nearly 2,000 copyrighted audiobooks. Downing Dec. ¶ 61. There is no dispute that Recorded Books owns copyrights in sound recordings of audiobooks that NetLibrary continues to distribute. *Id.* and Exhibit M. Indeed, NetLibrary recognized Recorded Books' ownership of valid copyrights when it executed the Agreement to receive the necessary authorization from Recorded Books before beginning to distribute its audiobooks in 2004. *See* Agreement, § 9(b) ("As between Recorded Books and netLibrary, Recorded Books will own all rights in and to the Publisher Products and the content and copyright to the NL Electronic Version(s) of the Publisher Products.").

### 2. NetLibrary Is Violating Recorded Books' Exclusive Rights in its Copyrighted Audiobooks.

It is equally clear that by copying and distributing Recorded Books' audiobooks to new subscribers after May 31, NetLibrary has violated at least two separate exclusive rights under 17 U.S.C. § 106:  the right "to reproduce the copyrighted work in copies or phonorecords," § 106(1); and the right "to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending," § 106(3).

When NetLibrary copies Recorded Books' audiobooks onto its servers, it necessarily reproduces them within the meaning of the Copyright Act, 17 U.S.C. § 106(1).  *See Advance Magazine Publishers*, 466 F. Supp. 2d at 637.  When NetLibrary rents or leases copies of Recorded Books' audiobooks to Subscribing Libraries, it violates Recorded Books' exclusive rights to distribute them under 17 U.S.C. § 106(3).  *See id.* at 637-38.

### 3. NetLibrary Is Not Licensed to Distribute Recorded Books' Audiobooks Because the Agreement Was Terminated.

Given that Recorded Books has established a prima facie claim of copyright infringement, NetLibrary's only arguable basis for continuing to copy and distribute Recorded Books' copyrighted audiobooks is that it is still licensed to do so under the Agreement.  But NetLibrary has no right or license to continue to engage in these activities because Recorded Books' termination of the Agreement was valid and effective.  Before Recorded Books terminated the Agreement, NetLibrary was licensed to provide Recorded Books' copyrighted audiobooks to Subscribing Libraries (and to reproduce and distribute the works as necessary in the process of doing so) pursuant to the Agreement.  Downing Dec. ¶ 8.  After Recorded Books' termination of the Agreement, pursuant to § 1(e)(iii) of Exhibit B of the Agreement, NetLibrary has a more limited license to provide Recorded Books' audiobooks only to those Subscribing Libraries who subscribed before May 31, 2007 through the expiration of those subscriptions.  *Id.*

16

¶¶ 51, 55 and n.5.  The limited license does not extend to subscriptions made or renewed after

May 31, 2007.  *Id.* ¶ 55 and n.5.  Where, as here, a copyright owner grants a limited license for

the use of its copyrighted work and the licensee exceeds the scope of the license, the licensee is

liable for copyright infringement.  *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 534-

35 (4th Cir. 2003); *see also LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150,

1156 (9th Cir. 2006) ("When a licensee exceeds the scope of the license granted by the copyright

holder, the licensee is liable for infringement.").

>          a.      **NetLibrary Triggered Recorded Books' Right to Immediately
>                  Terminate the Agreement by Violating the Agreement's
>                  Exclusivity Provision.**

The Agreement's unambiguous Exclusivity Provision permits Recorded Books

immediately to terminate the Agreement if NetLibrary, without Recorded Books' consent, enters

into another agreement to distribute the works of other audiobook publishers to Subscribing

Libraries via the Internet.  The Exclusivity Provision of the Agreement Provides that:

> If, without Recorded Books' consent, netLibrary signs an
> Agreement to allow another content provider to contribute Audio
> Book content and to participate in a Subscription sales model to
> which Recorded Books is not a party; then, subject to Section 1.(e)
> of Exhibit B, Recorded Books may give netLibrary written notice
> terminating this Agreement immediately.

Agreement, Exhibit C, § 1(a).

NetLibrary has specifically entered into at least two agreements "to allow other content

provider[s] to contribute Audio Book content and to participate in a Subscription sales model to

which Recorded Books is not a party," thereby triggering Recorded Books' right to terminate the

Agreement.

17

**i.    NetLibrary's Subscription Service with the Bibliographic Center for Research ("BCR") Violates the Exclusivity Provision.**

First, as set forth above, NetLibrary is distributing audiobooks from publishers other than Recorded Books through a subscription service called the "BCR Shared eAudiobook Collection" that it offers in conjunction with BCR. Downing Dec. ¶¶ 27-32. Based on BCR and NetLibrary's own promotional materials, it is clear that NetLibrary has entered into an "[a]greement to allow another content provider to contribute Audio Book content and to participate in a Subscription sales model to which Recorded Books is not a party." Agreement, Exhibit C, § 1(a).

In particular, just like the Recorded Books/NetLibrary subscription service, the BCR/NetLibrary subscription service allows patrons of BCR's member libraries to access and download selections from an initial bundled collection of audiobook works from a variety of non-Recorded Books publishers, and "new content or additional titles will be added to the collection on a regular basis (bi-annually)." Downing Dec. ¶ 30 and Exhibit B. Moreover, just like the Recorded Books/NetLibrary subscription service, the BCR/NetLibrary subscription service requires the subscribing libraries to "pay fees annually to participate in the BCR Shared eAudiobooks Collection." *Id.* ¶ 31 and Exhibit B. Indeed, in the contract that libraries are required to sign to get access to the "Shared eAudiobooks Collection," the libraries are even referred to as "Subscribers." *Id.* ¶ 32 and Exhibit C. There is no question that the BCR/NetLibrary subscription service is a "Subscription sales model" that violates the Exclusivity Provision of the Agreement.

18

### ii.    NetLibrary's Subscription Service with SOLINET Violates the Exclusivity Provision.

NetLibrary has also teamed with SOLINET (formally known as the Southeastern Library Network) to provide the "eAudiobook Collection," an Internet-based subscription service to SOLINET's member libraries. *Id.* ¶ 33. The SOLINET/NetLibrary "eAudiobook Collection" also contains titles from publishers other than Recorded Books. *Id.* ¶ 34.

As stated on the SOLINET website, "[u]nlike the shared eBook collections, the shared eAudiobook collection is a subscription." *Id.*, ¶ 35 and Exhibit D (emphasis added). Accordingly, due to NetLibrary's multiple breaches of the Agreement's Exclusivity Provision, Recorded Books was entitled, subject to certain wind-down provisions, to "give netLibrary written notice terminating this Agreement immediately," which it did on April 20, 2007. Agreement, Exhibit C, § 1(a).

### iii.   NetLibrary's Marketing, Sale, and Distribution of Non-Recorded Books Audiobooks Via the Internet Violates the Exclusivity Provision.

It is also clear from NetLibrary's own press releases and website that NetLibrary is violating the Agreement's provision that "[t]he Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet." *Id.* For example, on February 12, 2007, NetLibrary issued a press release announcing that it had "launched a new purchase model for its growing collection of eAudiobooks." Downing Dec. ¶ 37 and Exhibit E. According to the press release, "[l]ibrarians now have the option to add individual titles to their collections from leading publishers including Random House, Blackstone Audio, and many more to come." *Id.* In other words, in direct contravention of the Exclusivity Provision, NetLibrary is currently "market[ing], distribut[ing] and sell[ing] to

19

Recipients digital electronic versions of Audio Books that can be downloaded via the Internet" other than through "[t]he Subscription sales model described in th[e] Agreement." *Id.* ¶ 38; Agreement, Exhibit C, § 1(a).

> **b.    NetLibrary Triggered Recorded Books' Right to Terminate the Agreement by Failing to Meet Technical and Customer Service Standards.**

In addition to violating the Exclusivity Provision, NetLibrary has consistently failed to live up to its technical and customer service responsibilities under the Agreement. *See* Agreement, Exhibit B, § 1(d)(i) (requirement to perform activities "reasonably necessary to ensure site functionality"); Exhibit B, § 1(d)(ii) (requirement to perform "network and infrastructure activities reasonably necessary to ensure site maintenance and stability and to avoid material disruptions in service"); Exhibit B, § 1(d)(iii) (requirement to perform "activities reasonably necessary to ensure the performance of order processing, submittal, fulfillment, and customer support functions"); Exhibit B, § 1(d)(v) (requirement to perform a "reasonable quantity of customer support" for Subscribing Libraries). As described above and in the Declaration of Brian T. Downing, NetLibrary's failures have resulted in a near-endless stream of customer complaints, most of which have yet to be remedied. These failures and complaints are described in detail above. *See supra* at 8-11; *see also* Downing Dec. ¶¶ 41-50.

The Agreement provides that if NetLibrary breaches the Agreement, as it did when it committed these technical and customer service failures, then Recorded Books "may terminate this Agreement at any time after providing [NetLibrary] with 60 days' prior written notice of the occurrence of … [the] violat[ion] [of] any material provision of this Agreement or … breaches of this Agreement that, in the aggregate, are material." Agreement, § 4(b). Recorded Books provided NetLibrary with notice of the foregoing breaches, in many cases far more than sixty

days in advance of its April 20, 2007 termination of the Agreement.  Nevertheless, those breaches were never cured.  Downing Dec. ¶¶ 42-46, 51.

**B.     Recorded Books Is Likely to Succeed on the Merits of its False Advertising Claim.**

NetLibrary is currently engaging in false advertising by stating or implying on its website, in its promotional materials, and directly to the Subscribing Libraries that it is authorized to distribute Recorded Books' audiobooks to new Subscribing Libraries.  *Id.* ¶¶ 55-58.  Such advertising not only misleads customers as to the availability of new subscriptions for Recorded Books' audiobooks, but tarnishes Recorded Books' reputation by implying a prospective association between Recorded Books and NetLibrary's substandard service.

In order to prove a claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), a party must demonstrate the following five elements, all of which are present here.  First, the plaintiff must show that "the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product."  *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272 (4th Cir. 2002).  NetLibrary is presently stating to customers that it will provide access to new subscribers to Recorded Books' content, and thus falsely representing that it is authorized to do so.  Downing Dec. ¶¶ 57-58 and Exhibit L.

Second, the plaintiff must show that "the misrepresentation is material, in that it is likely to influence the purchasing decision."  *Scotts Co.*, 315 F.3d at 272.  NetLibrary's misrepresentation—concerning its authorization to provide the very product it is advertising, and thus whether the consumer can ultimately receive the product legally—could not be more central to a consumer's purchasing decision.

21

Third, the plaintiff must show that "the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience." *Id.* NetLibrary's untrue representation that it is authorized to provide Recorded Books' audiobooks to prospective subscribers has a strong tendency to deceive all of its audience; most potential new subscribers would have no reason to doubt the statement's veracity.

Fourth, the plaintiff must show that "the defendant placed the false or misleading statement in interstate commerce." *Id.* From its Colorado headquarters and on its website, NetLibrary advertises and provides audiobook subscription services to libraries all over the United States. Downing Dec. ¶¶ 7-8, 57.

Finally, the plaintiff must show that it "has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales, or by a lessening of goodwill associated with its products." *Scotts Co.*, 315 F.3d at 272. The goodwill associated with Recorded Books' products will be impaired by the false prospective association that NetLibrary implies between itself and Recorded Books in its advertising.

**C.    Recorded Books Is Likely to Succeed on the Merits of its Claim for Ongoing Breach of the Agreement.**

As explained in detail above, NetLibrary committed numerous breaches of the Agreement, including violations of its standards for technical and customer service and the Exclusivity Provision. *See supra* at 8-11; *see also* Downing Dec. ¶¶ 41-50. On the basis of NetLibrary's violations, Recorded Books terminated the Agreement. Recorded Books' termination triggered the Agreement's "Transition of Services," or wind-down, clause. The wind-down clause provides that existing subscriptions will continue to be serviced, but that NetLibrary "will on the effective date of termination cease selling and marketing Subscriptions."

22

Agreement, Ex. B, § 1(e)(iii) (emphasis added). By selling subscriptions, NetLibrary is presently violating that requirement. Downing Dec. ¶¶ 55-58.

## II.    Recorded Books Faces Irreparable Harm if the Injunction Is Denied.

"If a plaintiff establishes a prima facie claim of copyright infringement, the district court may presume that it could show both probable likelihood of success on the merits and irreparable harm, for purposes of granting a preliminary injunction." *Advance Magazine Publishers*, 466 F. Supp. 2d at 638 (citing *Serv. & Training Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992)). Recorded Books has gone beyond establishing a prima facie case of copyright infringement and has presented evidence of substantial willful infringement by NetLibrary. The presumption of irreparable harm thus applies.

Beyond the presumption of irreparable harm, Recorded Books is subject to clear financial and reputational harm from NetLibrary's infringement. Recorded Books terminated the Agreement with NetLibrary primarily because NetLibrary violated an Exclusivity Provision that was designed to maintain the value of the two parties' joint subscription service. Not only did NetLibrary dilute the value of the Recorded Books/NetLibrary service by establishing competing subscription services in violation of the Agreement, it now continues to distribute Recorded Books' works without authorization. Downing Dec. ¶¶ 27-40, 55-58. All of these actions by NetLibrary have caused and will continue to cause Recorded Books substantial financial harm.

In addition to causing direct financial harm, NetLibrary's continued illegal distribution of Recorded Books' audiobooks has and will continue to harm Recorded Books' reputation with libraries and their patrons. As discussed above, NetLibrary has provided substandard technical service to libraries and failed to address those technical problems with adequate customer support. *See supra* at 8-11; *see also* Downing Dec. ¶¶ 41-50. As a result, Recorded Books' reputation with its customers has been harmed. It will continue to be harmed if NetLibrary

23

distributes Recorded Books' audiobooks to new customers in violation of the Copyright Act. Downing Dec. ¶¶ 61-62.

Recorded Books faces irreparable reputational (and consequent financial) harm if the injunction is denied and NetLibrary continues to falsely represent that it is authorized to distribute Recorded Books' content to new Subscribing Libraries. *Id.* Moreover, a demonstration that a defendant's advertising tends to mislead consumers (which NetLibrary's must) satisfies the irreparable harm prong of the test for a preliminary injunction. *See JTH Tax, Inc. v. H & R Block E. Tax Servs., Inc.*, 128 F. Supp. 2d 926, 948 (E.D. Va. 2001) ("[A] demonstration that the competitor's advertising tends to mislead consumers satisfies the [Lanham] Act's irreparable harm requirement."), *aff'd in relevant part*, 28 Fed. Appx. 207 (4th Cir. 2002); *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 862 (E.D. Va. 1998) ("Courts have explained that a demonstration that the competitor's advertising tends to mislead consumers satisfies the Lanham Act's irreparable harm requirement.").

## III.    Enjoining the Misuse of Recorded Books' Audiobooks Will Result in No Cognizable Harm to NetLibrary.

NetLibrary "cannot claim a cognizable harm in being prevented from making a profit through infringing activity, thus this factor weighs in favor of" Recorded Books. *Advance Magazine Publishers*, 466 F. Supp. 2d at 638. Moreover, NetLibrary has demonstrated that it will be able to continue its audiobook subscription services without Recorded Books' involvement; it has already created competing services with content from other publishers. Downing Dec. ¶¶ 27-38.

Indeed, NetLibrary and Recorded Books specifically bargained for injunctive relief to be the primary remedy to redress ongoing breaches of the Agreement. The Agreement provides that in the event of a breach by either party, the "non-breaching party may seek injunctive relief in

any court of competent jurisdiction to enjoin or restrain the breaching party from continuing to do any act or commit any violation or threatened breach of a material provision of this Agreement." Agreement, § 8.  In contrast, the Agreement strictly limits the damages that either party may recover for a breach of the Agreement.  *Id.*

In light of the fact that NetLibrary specifically agreed that it would be subject to injunctive relief for any breach of the Agreement (and strictly limited the availability of any other form of relief), it would make no sense for it now to take the position that such an injunction should not issue because it would cause it harm.

**IV.    The Public's Interest Will Be Served by Halting NetLibrary's Ongoing Copyright Infringement, False Advertising, and Breach of the Agreement.**

The "public interest is the interest in upholding copyright protections." *Advance Magazine Publishers*, 466 F. Supp. 2d at 638 (quoting *Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1499 (10th Cir. 1993)).  "Since Congress has elected to grant certain exclusive rights to the owner of a copyright in a protected work, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriations of the skills, creative energies, and resources which are invested in the protected work." *Id.* (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254-55 (3d Cir. 1983)).  The public interest therefore weighs in favor of enjoining NetLibrary's ongoing copyright infringement.

With respect to NetLibrary's false advertising, "the public interest favor[s] truth in advertising." *Activex Am., Inc. v. DTC Health, Inc.*, 381 F. Supp. 2d 486, 487 (M.D.N.C. 2005).  In this case, where NetLibrary's statements are plainly false and likely to mislead consumers, considerations of public interest weigh strongly in favor of issuing the requested injunction.

25

NetLibrary's ongoing breach of the Agreement (by continuing to advertise and distribute Recorded Books' copyrighted works without a license), is resulting in the same harms to the value of Recorded Books' copyrights and the same public confusion as its violations of the Copyright Act and the Lanham Act.  Public interest therefore also favors issuing an injunction to stop NetLibrary's continuing breach of the Agreement.

## **CONCLUSION**

For the foregoing reasons, Recorded Books respectfully requests that this Court immediately grant a preliminary injunction according to the terms more specifically set out in the accompanying proposed Order.

Dated:  June 19, 2007

Respectfully submitted,

RECORDED BOOKS, LLC

By its attorneys,

/s/ R. David Hosp
David L. Permut (15111)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
202.346.4000 (tel.)
202.346.4444 (fax)

-and-

R. David Hosp (admitted *pro hac vice*)
Jaren D. Wilcoxson (admitted *pro hac vice*)
Robert D. Carroll (admitted *pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
617.570.1000 (tel.)
617.523.1231 (fax)

LIBA/1796034.8