IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RECORDED BOOKS, LLC<br><br>               Plaintiff/Counter<br>               Defendant,<br><br>v.<br><br>OCLC ONLINE COMPUTER LIBRARY<br>CENTER, INC. d/b/a NETLIBRARY,<br><br>               Defendant/Counter<br>               Plaintiff. | Case No. 07 CV 1427 (DKC) |

## DEFENDANT NETLIBRARY'S RESPONSE TO PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

OCLC Online Computer Library Center, Inc. d/b/a NetLibrary ("NetLibrary"), by and through

its counsel, hereby responds to Plaintiff Recorded Books, LLC's ("Recorded Books") Motion for

Preliminary Injunction.

## INTRODUCTION

Recorded Books is asking the Court for a preliminary ruling that it can terminate the parties'

2004 eContent Production and Distribution Agreement ("Agreement").  Recorded Books cannot meet

the heightened burden required for a preliminary injunction.  A copy of the Agreement is attached to the

Declaration of Scott Wasinger ("Wasinger Dec."), ¶ 7, as Exhibit 1 (cited to as *Agreement*).

NetLibrary is the "electronic content" or "eContent" division of a nonprofit company focused on

helping libraries provide affordable access to information.  Recorded Books is one of the world's largest

audiobook publishers.  In 2004, NetLibrary and Recorded Books (the "Parties") agreed to create a

system for the production and distribution of downloadable electronic audiobooks to public, academic,

and military libraries. Expecting that it would take a significant amount of time and money to establish this system, the Parties included provisions for automatic extensions through 2010 or later, and, minimally, a three-year wind-down provision in the event Recorded Books terminated the Agreement. Over the past three years, NetLibrary created a platform to bring Recorded Books' content to over 1,700 libraries. Recorded Books now wants to escape the bargained-for Agreement well before it is set to expire and has moved for preliminary relief to facilitate its exit.

As explained below, Recorded Books must make a "strong" or "substantial" showing that it has "a very clear and strong case" that NetLibrary materially breached the Agreement. It cannot do so. First, the Agreement does not contain a so-called "Exclusivity Provision" that prohibits NetLibrary from selling any non-Recorded Books audiobooks. The provision cited by Recorded Books is merely an "exclusive means" provision designed to protect Recorded Books' pre-selected "Bundled Collections" of books. Second, NetLibrary's e-audiobook "for purchase" agreements do not breach the "exclusive means" provision because that provision only prohibits NetLibrary from signing an agreement to allow another content provider to contribute e-audiobook content to a Recorded Books' Bundled Collection without Recorded Books' consent. Third, all of NetLibrary's technical services were commercially reasonable and the few issues raised by Recorded Books were addressed by NetLibrary in a timely manner. Fourth, Recorded Books did not give the required 60-day notice to cure regarding any technical complaints. Accordingly, Recorded Books' motion must be denied.

## FACTUAL BACKGROUND

### I.     The Parties

Recorded Books is the world's largest independent producer and holder of recorded audiobooks. *See* Memorandum in Support of Recorded Books, LLC's Motion for Preliminary Injunction ("Plaintiff's

Brief"), 4. Audiobooks are recordings of books read aloud. Wasinger Dec. ¶ 3. Recorded Books offers more than 7,000 audiobook titles and, in 2006 alone, had revenue from the distribution of audiobooks and related materials that exceeded $80 million. Plaintiff's Brief, 2-3.

NetLibrary is a division of a nonprofit company whose mission is to help libraries throughout the world improve their services and to provide affordable access to information. Wasinger Dec.¶ 3. NetLibrary creates specialized platforms to distribute electronic digital file versions of audiobooks ("e-audiobooks") and books ("e-books," not a part of this dispute) to libraries and their patrons. *Id.* ¶ 4. NetLibrary is not a publisher; rather, it depends on audiobook publishers for content to convert. *Id.* ¶ 5.

Much of NetLibrary's content comes from Recorded Books. Until 2007, Recorded Books' provided almost 100% of NetLibrary's e-audiobook content. *Id.* ¶ 6. Recorded Books' content accounts for nearly all of NetLibrary's audiobook revenue and between 30% and 40% of total revenue. *Id.*

NetLibrary can only distribute Recorded Books' e-audiobooks in "Bundled Collections," and can only distribute these Bundled Collections by "Subscription sales agreements." *Id.* ¶ 11. Bundled Collections include the 800-title "Core Collection" with its mixed variety of award-winning and popular titles, the 200-title "Essentials Collection" with literary classics, and the 250-title "Children's and Young Adult Collection." *Id.* Under this "Subscription" arrangement, libraries pay anywhere from $2,500 to $50,000 a year for unlimited, simultaneous access up to 3,500 to 100,000 "check-outs" from each Bundled Collection, depending on the chosen collection and the size of the subscribing library. *Id.* But, libraries do not have an ability to select specific titles for inclusion in a Bundled Collection or to purchase licenses for continued use. *Id.*

In early 2007, two years after establishing the subscription sales model for Recorded Books, NetLibrary began to sell single titles of other e-audiobooks to libraries under "for purchase" agreements.

3

*Id.* ¶ 12.  The for-purchase model allows libraries to purchase (and own) e-audiobooks to use on the NetLibrary host platform.  *Id.*  Libraries can purchase individual or multiple titles, but must do so on a one-user-per-license basis.  *Id.*  Unlike under the subscription model, for-purchase customers cannot access pre-selected Bundled Collections and do not receive unlimited access to titles. *Id.*

For example, NetLibrary sold the Saint Paul Public Library 107 e-audiobooks under the "for purchase" program in two separate sales (one in April 2007 and one in June 2007).  The total value of these sales was $5,861.57 (or, $54.78 per title, on average).  *Id.* ¶ 13.  Instead of a Subscription for unlimited, simultaneous access to the Core Collection of over 800 e-audiobooks (which would cost $25,000.00), the Saint Paul Public Library purchased a permanent license for 107 e-audiobooks for $5,861.57.  *Id.* (purchase agreements attached as Exhibit 3 thereto).

NetLibrary also sells e-audiobooks under the "for purchase" model to nonprofit library consortia like the Bibliographical Center for Research ("BCR") and the Southeast Library Network ("SOLINET").  *Id.* ¶ 14.  These consortia are groups of libraries that join together for communal purchasing.  *Id.*  A "for purchase" transaction by a consortium is no different than a "for purchase" transaction by a library.  *Id.*  The consortium's members, however, have agreed to share the purchased titles with one another in order to give patrons of participating libraries access to more e-audiobooks than each library could otherwise afford.  *Id.* (purchase agreements attached as Exhibits 4 and 5 thereto).

**II.      The Agreement with Recorded Books.**

**A.      Rights To Copyrighted Material and Other Obligations**

Section 3 of the Agreement gives NetLibrary the right to possess, reproduce, and distribute electronic versions of Recorded Books' audiobooks.  Specifically, NetLibrary has the "worldwide, nonexclusive right and license" to: (i) "market, distribute, and sell . . . Bundled Collection(s)" of

4

Recorded Books' e-audiobooks; (ii) "produce, convert, and integrate" electronic versions of Recorded Books' audiobooks; (iii) "load, store, use, copy, and reproduce" electronic versions of Recorded Books' audiobooks; and (iv) "grant rights to [libraries] to download" electronic versions of Recorded Books' audiobooks. *Agreement,* § 3(a).

Exhibit B and Schedule B-1 to the Agreement set forth NetLibrary's technical and customer service obligations. NetLibrary agreed to "use reasonable commercial efforts to perform" its services. *Id.,* Exhibit B, § 1.(a). Among other duties, this section governs the obligations raised in Recorded Books' opening brief regarding indexing, authentication process, MARC Records, download, network and infrastructure, and order processing. *Id.* § 1(d); *id.,* Schedule B-1, §§ 3-6.

Section 4 of the Agreement provides that if either party violates any material provision of the Agreement, the non-breaching party must provide a 60-day cure period:

> Either party (the non-breaching party) may terminate this Agreement at any time after providing the other party with 60 days' prior written notice of the occurrence of [a "material" breach event] unless the other party cures or remedies the event within the 60-day period following receipt of the written notice . . . .

*Id.* §§ 4(b) and 4(b)(ii)(application to Exhibit B). Notice must be given in accordance with Section 11(i). *Id.* §§ 4(b)(ii), 11(i).

**B.     Term of Agreement**

The Agreement initially runs through September 10, 2007. *Id.* §§ 2(a)(v), 4(a)(i). If revenue in year three (2006-2007) exceeds $5,000,000, then the original term of the Agreement automatically extends to September 10, 2010. *Id.* § 4(a)(i)(1). If revenue in 2006-2007 exceeds $3,000,000 but is below $5,000,000, then the term of the Agreement will automatically extend to September 2008 and for additional one-year terms thereafter. *Id.* § 4(a)(2). Revenues in 2005-2006 exceeded $5,000,000 and, at

the time of this lawsuit, revenues for 2006-2007 exceeded $3,000,000 and were on track to exceed $5,000,000.  Wasinger Dec. ¶ 10.

Once revenue exceeded $3,000,000 in year three (2006-2007), the automatic renewal and phase-out provisions engaged.  The Agreement will automatically renew in 2008 unless either party provides 180 days' written notice of termination.  If Recorded Books terminates, then there is a three year "phase-out" period.  *Agreement,* § 4(2).  During the phase-out period, NetLibrary can continue to host and sell Recorded Books.  *Id.*

### C.    Other Publishers and Recorded Books' "Bundled Collection(s)"

NetLibrary agreed to "market, sell, and distribute to Recipient(s) Subscriptions to Bundled Collections of NL Electronic Versions of the Publisher Products."  *Agreement,* introduction, at p. 1.  The Agreement defines the following at section 2(a):

> (ii)     **'Audio Book File'** means a digital electronic version of the Publisher Product . . . .
>
> * * *
>
> (iii)    **'Bundled Collection(s)'** means a combined collection of NL Electronic Versions of Publisher Products that netLibrary and Recorded Books have agreed to group together for sale as a Subscription.
>
> * * *
>
> (ix)     **'Publisher Products'** means specific content controlled by Recorded Books . . . .
>
> * * *
>
> (x)     **'Recipient'** means a public, school, or university library; military base; or any library associated with these institutions. . . .
>
> * * *
>
> (xiii)    **'Subscription'** means an annual license for access to a Bundled Collection on the basis described in Exhibit C.

*Id.,* § 2(a) (emphasis added).  In other words, NetLibrary agreed to: sell Recorded Books' content only in pre-selected combined collections; sell Recorded Books' collections only through Subscription

agreements; and sell only to military bases, libraries, or related entities. Wasinger Dec. ¶ 8. NetLibrary cannot sell individual titles or "any other rights in the Bundled Collection." *Agreement,* Exhibit C, § 1.(b).

Recorded Books expressly agreed to "allow other content providers to contribute content and participate in this Subscription sales model on equivalent terms." *Id.,* Exhibit C § 1.(a). In addition, the Parties agreed that if NetLibrary wished to work with other publishers, "different terms may be agreed to for other publishers' audio books." *Id.,* Exhibit C, § 2.(a)(iii).

Before it can put other publishers' audiobooks into a Recorded Books' Bundled Collection, however, NetLibrary must obtain Recorded Books' consent. Exhibit C, section 1(a), states in part:

> If, without Recorded Books' consent, netLibrary signs an Agreement to allow another content provider to contribute Audio Book content and to participate in a Subscription sales model [defined as dealing exclusively with Recorded Books' Bundled Collections] to which Recorded Books is not a party; then, subject to Section 1.(e) of Exhibit B, Recorded Books may give netLibrary written notice terminating this Agreement immediately.

The Agreement does not contain any so-called "Exclusivity Provision." Inserting the Agreement's relevant definitions, Section 1 of the Agreement explains that the restrictive portions of Exhibit C simply "describe[] the business terms upon which Recorded Books and netLibrary have agreed to market, sell, and distribute Bundled Collections [combined collections that the Parties have grouped together for sale as a Subscription] of Publisher Products [Recorded Books' content]." *Id.* § 1.(d).

### III.     Recorded Books Attempts To Terminate the Agreement

On April 20, 2007, Recorded Books' attorney sent NetLibrary a letter claiming to terminate the Agreement. Wasinger Dec. ¶ 15, Exhibit 6 (attached thereto). The letter stated that Recorded Books was entitled to immediately terminate the Agreement pursuant to both Section 4(b)(ii) and Exhibit C

(violation of the exclusive means provision).  *Id.*   Notably, the letter did not provide a 60-day right to cure.  *Id.* ¶ 16.  The letter did, however, say that Recorded Books would continue to deliver new titles to NetLibrary for those NetLibrary subscriptions currently in effect.  *Id.*

## ARGUMENT

The grant of a preliminary injunction is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it."  *Person v. Mayor and City Council of Baltimore,* 437 F. Supp. 2d 476, 479 (D. Md. 2006) (quoting *Direx Israel, Ltd. v. Breakthrough Medical Corp.,* 952 F.2d 802, 811 (4th Cir. 1991)).  Seeking such relief requires "demonstration of a need to protect the status quo and to prevent irreparable harm during the pendency of the litigation to preserve the court's ability in the end to render a meaningful judgment on the merits."  *Sun Microsystems, Inc. v. Microsoft Corp.,* 333 F.3d 517, 526 (4th Cir. 2003).

The factors that a court must weigh in assessing a motion for preliminary injunction are well-settled in this Circuit:  (1) the likelihood of irreparable harm to the plaintiff if injunctive relief is denied; (2) the likelihood of harm to the defendant if the requested relief is granted; (3) the likelihood that the plaintiff will succeed on the merits of the action; *and* (4) the public interest.  *Id.; Direx Israel,* 952 F.2d at 811 (Fourth Circuit's adoption of "hardship balancing test" over "likelihood of success" test).

"In applying this four-factored test, the irreparable harm to the plaintiff and the harm to the defendant are the two most important factors."  *Microsoft Corp.,* 333 F.3d at 526.  Under the "hardship balancing test," the plaintiff must first make a "clear showing of irreparable harm" before any of the other factors are to be considered.  *Id.*  The movant's burden of proof is determined by a sliding scale. Where the balance of harms "does not tip 'decidedly' or 'significantly' in favor of the plaintiff," the plaintiff must make out a "very clear and strong" case.  *Direx Israel,* 952 F.2d at 813, 818.  The court in

*Mycalex Corp. v. Pemco Corp.,* 159 F.2d 907, 912 (4th Cir. 1947) referred to this burden as "a clear and convincing showing."

## I.     Recorded Books Cannot Demonstrate Irreparable Harm.

Recorded Books argues that it is either entitled to a presumption of irreparable harm or, alternatively, that it will suffer reputational and economic harm if the injunction is not granted.  Legally, this dispute does not warrant a presumption.  Factually, there is no irreparable harm.

First, Recorded Books is not entitled to a presumption of irreparable harm because its copyright claim depends entirely on an interpretation of the Agreement.  Where, as here, a copyright claim turns on the interpretation of a license agreement, the Court must consider "the application for preliminary injunction" as it would "in any contract case."  *Video Trip Corp. v. Lightning Video, Inc.,* 866 F.2d 50, 52 (2d Cir. 1989) (affirming denial of preliminary injunction where "[t]he real question presented . . . could only be resolved by determining the contractual obligations of the parties [and n]either substantive nor procedural copyright law was involved in the resolution of the dispute."); *see also Allora, LLC v. Brownstone, Inc.,* 2007 WL 1246448, **5-8 (W.D. N.C. 2007) (rejecting preliminary injunction where copyright claim depended entirely on alleged breach of parties' licensing agreement); *cf. Advance Magazine Publishers, Inc. v. Leach,* 466 F. Supp. 2d 628, 632-638 (D. Md. 2006) (Court opting to presume irreparable harm where the facts of copyright infringement case were "uncontroverted").

Second, Recorded Books' claim of actual harm falls short.  Recorded Books must detail exactly how it will suffer irreparable harm that is "neither remote nor speculative, but actual and imminent."  *Direx Israel,* 952 F.2d at 812; *Allora, LLC,* 2007 WL 1246448, at *4.

A claim of "financial harm," as Recorded Books alleges, is neither "irreparable" nor "immediate."  *See Hughes Network System, Inc. v. Interdigital Commc'ns Corp.*, 17 F.3d 691, 694 (4th

Cir. 1994); *Person,* 437 F. Supp. 2d at 480 (stating that "[h]arm is not 'irreparable' if it can be compensated by money damages during the normal course of litigation"). The bulk of Recorded Books' alleged harm is purely economic. Plaintiff's Brief, 23. Moreover, Recorded Books provides no specific or tangible evidence suggesting that NetLibrary's individual purchase arrangements with BCR and SOLINET are causing Recorded Books any harm. As the "world's largest independent publisher and distributor of unabridged audiobooks," it is difficult to see how two small consortia purchasing books by other publishers could have any impact. Likewise, the Agreement is not holding Recorded Books back – Recorded Books has not claimed to have found a substitute downloadable e-audiobook delivery system. Wasinger Dec. ¶18. There is no lost opportunity and the Agreement should be enforced.

Recorded Books' claim of harmed reputation is also incorrect. Unsubstantiated, generalized claims about loss of goodwill and unfair competition are insufficient, especially where the injunction could harm the defendant. *See Allora,* 2007 WL 1246448, **5-6; *see also Random House, Inc. v. Rosetta Books LLC,* 283 F.3d 490, 492 (2d Cir. 2002). Recorded Books has raised complaints by 15 libraries out of 1,700 subscribing libraries – a mere .009%. Wasinger Dec. ¶¶ 20-21. Such a small group would not "irreparably" or "immediately" harm any company, let alone a market leader like Recorded Books. To the contrary, the program is more popular and successful than the Parties expected. *See id.* ¶ 21.

Moreover, if Recorded Books' claim of harm to reputation cannot be remedied by a preliminary injunction, then it cannot not weigh in favor of an injunction. *See The Hunter Group, Inc. v. Smith,* 1998 WL 682154, *4 (4th Cir. 1998) ("preliminary injunction will not issue unless it will remedy the alleged injuries"). Recorded Books agreed to associate itself with NetLibrary for a significant period of time – even after the termination of the Agreement. *Agreement,* § 4(a). If preliminary relief were

granted, Recorded Books would still be obligated to provide content to NetLibrary for ongoing subscriptions (i.e., for libraries with subscriptions running as long as July 2009). *Id.* § 4(c) (post termination obligations); Wasinger Dec. ¶ 19. Any reputational link, therefore, will continue regardless of any preliminary relief.

## II.    An Injunction Would Seriously Harm NetLibrary and Its Libraries.

If a preliminary injunction is issued, NetLibrary's entire business will be affected. NetLibrary is a division of a non-profit organization focused on helping libraries. Wasinger Dec. ¶ 3. In the bargained-for Agreement, NetLibrary agreed to create a production and distribution platform for Recorded Books' content. *Id.* ¶ 17. In exchange, NetLibrary received a long-term commitment and a significant (three-year) phase-out period after termination so that it could transition its libraries, as well as reallocate its employees, develop new products, and refocus its sales team. *Id.* ¶ 17; *Agreement,* § 4(a)(2). Unlike with Recorded Books' established and diversified business, an immediate termination would remove one of NetLibrary's largest product lines, nearly all of its e-audiobook business, and approximately 30-40% of its total revenue. Wasinger Dec. ¶ 17. It would also cut off renewal access to NetLibrary and 1,700 subscribing libraries, without any plan as to whether or how Recorded Books will offer digital downloadable versions of e-audiobooks in the future. *Id.* ¶ 18. This derailment weighs against Recorded Books' motion. *See Random House, Inc.,* 283 F.3d at 492 (balance of harms favors defendant where injunction could affect entire business but where plaintiff's business would be minimally affected by denying the injunction).

Recorded Books claims that NetLibrary faces no "cognizable" harm because it cannot claim harm from its "infringing activity." Plaintiff's Brief, 24-25. This argument begs the question. The issue of "infringement" comes only after addressing the harm in terminating the Agreement. Moreover, the

Fourth Circuit Court of Appeals cautions against such arguments. *Scotts Co. v. United Inds. Corp.,* 315 F.3d 264, 284-85 (4th Cir. 2002) (cautioning against "self-inflicted harm" arguments). The question is not what harm NetLibrary will suffer from a *properly* granted injunction; but rather what harm NetLibrary will suffer if the injunction is in error. *Id.* Here, the balance tips strongly toward NetLibrary because granting an injunction would harm NetLibrary far more than the status-quo would harm Recorded Books.

### III.    Recorded Books Is Unlikely To Succeed on the Merits.

Recorded Books cannot demonstrate likelihood of success on the merits of its claims. Because the balance of harms does not tip "decidedly" or "significantly" in its favor, Recorded Books must make out a "very clear and strong" or "convincing" case that NetLibrary materially breached the Agreement. *Direx Israel, Ltd.,* 952 F.2d at 813, 818. "If there is doubt as to the probability of [Recorded Books'] ultimate success on the merits, the preliminary injunction must be denied." *Id.* at 813.

Each of Recorded Books' identified claims – Copyright Infringement, Lanham Act, Breach of Contract – requires a finding that Recorded Books properly and effectively terminated the Agreement by its April 20, 2007 letter.[1] Recorded Books claims violations of three provisions: (1) an alleged "Exclusivity Provision" by selling e-audiobooks with non-Recorded Books' content; (2) the exclusive means provision by selling "Subscription sales agreements" with non-Recorded Books' content; and (3)

---

[1] It has no copyright claim unless NetLibrary is infringing. *NXIVM Corp. v. The Ross Institute,* 364 F.3d 471, 477 (2d Cir. 2004). NetLibrary is infringing only if the Agreement has been terminated. Plaintiff's Brief, 16-17. Recorded Books' Lanham Act claim survives only if NetLibrary is *falsely* representing to subscribers that it is authorized to provide Recorded Books' content to subscribing libraries *Id.* at 21-22. The representations are false only if the Agreement is terminated. *Id.* Finally, NetLibrary is committing an "ongoing breach" of the Agreement only if the Agreement has been terminated. *Id.* at 22-23.

certain technical specifications.   The threshold question, therefore, is whether Recorded Books has clearly and convincingly shown that NetLibrary breached these three provisions.

**A.    NetLibrary Did Not Violate Any Global Exclusivity Provision Because There Is No Such Provision.**

Recorded Books claims that NetLibrary violated a general "Exclusivity Provision" in Exhibit C by selling non-Recorded Books audiobooks to libraries.  Recorded Books relies on the first sentence of Exhibit C, paragraph 1(a), which states: "[t]he Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet."  The defined terms and stated purpose of the Agreement contradict Recorded Books' interpretation.   Moreover, NetLibrary, as a 501(c)(3) nonprofit company, could not have agreed to such a general exclusivity provision as it runs counter to its stated mission.

"Interpretation of an agreement purporting to grant a copyright license is a matter of state contract law."  *Random House,* 150 F. Supp. 2d at 617-18.   The Agreement states that it "will be governed by and construed in accordance with the laws of the State of New York, U.S.A." *Agreement,* § 11(c).   Under New York contract law, the Court must consider "the entire contract and reconcile all parts, if possible, to avoid an inconsistency."  *Random House,* 150 F. Supp. 2d at 618.   "Words in a contract are to be construed to achieve the apparent purpose of the parties.   Although the words might seem to admit of a larger sense, yet they should be restrained to the particular occasion and to the particular object which the parties had in view."  *Szalkowski v. Asbestospray Corp.,* 259 A.D.2d 867, 868 (N.Y. Sup. Ct. 1999).   "Where one interpretation is broader than another, courts should not apply the broader interpretation absent a clear manifestation of intent."  *Bank of New York v. Amoco Oil Co.,* 35 F.3d 643, 661-62 (2d Cir. 1994).   Where the parties' interpretation of a contract conflicts, the Court

must choose the most reasonable interpretation. *See Random House,* 150 F. Supp. at 620. Applying these principles, Recorded Books' argument for an "Exclusivity Provision" is not clear and convincing.

First, the general purpose of Exhibit C is to shelter the Bundled Collections. Exhibit C is not called an "Exclusivity Provision." Nothing is Exhibit C purports to be an "exclusivity provision." Rather, Exhibit C is called "Audio Book Commercial Terms" and section 1 of Exhibit C (where the alleged "exclusivity provision" is alleged to reside) is called "Special Terms Applicable to Audio Books."[2] Indeed, as the very first paragraph of the Agreement states: "Exhibit C describes the business terms upon which Recorded Books and netLibrary have agreed to market, sell, and distribute Bundled Collections [which are defined as combined collections of Recorded Books' content that the parties have grouped together for sale by Subscription] of Publisher Products [which are defined as only Recorded Books' content]." *Agreement,* § 1.(d). Accordingly, the Agreement governs only the treatment of Bundled Collections of ***Recorded Books'*** content.

Second, the defined terms (signaled by capitalized terms) and surrounding provisions of the Agreement make clear that Exhibit C's sole purpose is to shelter the Bundled Collections. The subject sentence of Exhibit C reads:

> The Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet.

*Id.,* Exhibit C, § 1.(a). It contains several defined terms. For example, the term "Subscription sales agreement" is limited to "Bundled Collections," which are expressly limited to "content controlled by Recorded Books." *Agreement* §§ 2(a)(iii), (ix), and (xiii). This sentence, therefore, provides that the

---

[2] The term Audio Book also appears to be a defined term. The Agreement defines Audio Book File as a digital electronic version of a Recorded Books title. *Agreement,* § 2(a)(ii).

only way NetLibrary can sell Recorded Books' audiobook content is by the "Subscription sale model." It is not referring to other publishers' products. Here, the only way NetLibrary is distributing Recorded Books' content is through the Subscription sales model. The "for purchase" model is only for non-Recorded Books content. Therefore, this provision is inapplicable.

Third, the Agreement expressly authorizes NetLibrary to do business with other, non-Recorded Books publishers. Exhibit C, section 2(a)(iii) states that "[t]he Parties have further agreed that different terms may be agreed to for other publishers' audio books." Even for Bundled Collections, the middle sentence of Exhibit C, section 1(a), states that "[n]etLibrary and Recorded Books will allow other content providers to contribute content and to participate in this Subscription sales model on equivalent terms." If NetLibrary were prohibited from ever dealing with other content providers, as Recorded Books argues, then these provisions providing for "different terms" for "other publishers" would be internally inconsistent and rendered meaningless; the terms for other publishers' audiobooks cannot be both "different" and "equivalent."

Fourth, a global exclusivity provision would be inconsistent with NetLibrary's nonprofit status. The mission of NetLibrary's company is to help libraries throughout the world improve their services and provide affordable access to information. Wasinger Dec. ¶ 3. As NetLibrary has explained to Recorded Books, an agreement to distribute only a single for-profit company's products would contradict that purpose and thus OCLC (and its divisions) will not sign such provisions. *Id.* ¶ 9, Exhibit 2 (attached thereto); *see also National Collegiate Athletic Ass'n v. Commissioner,* 92 T.C. 456, 464-68 (1989) (imputing for-profit business activity to non-profit for tax purposes where relationship between non-profit and for-profit business was exclusive).

**B.     NetLibrary Has Not Entered Into a "Subscription sales model" with Any Other Publisher.**

Recorded Books also argues that NetLibrary violated the "exclusive means" provision in Exhibit C by selling to library consortia. There is an "exclusive means" provision that allows immediate termination if NetLibrary "signs an Agreement to allow another content provider to contribute Audio Book content and to participate in a Subscription sales model [defined as selling temporary access to a Recorded Books' Bundled Collection] to which Recorded Books is not a party." *Agreement,* Exhibit C, § 1.(a). In support of its argument, Recorded Books argues that this provision prohibits NetLibrary from selling any type of subscription for any type of audiobooks. Recorded Books' reading is contrary to the language and purpose of the Agreement. In any case, NetLibrary has not allowed any other content provider to contribute content or participate in a subscription agreement, nor has it entered into any other kind of subscription agreement. Wasinger Dec. ¶ 11.

First, the Agreement allows termination only for unauthorized contribution to a "Subscription sales model" involving Bundled Collections of Recorded Books' content. *Agreement,* Exhibit C, ¶1(a). 'Subscription sales model' is defined as temporary access to Bundled Collections of Recorded Books' content. *Id.* §§ 2(a)(iii) and 2(a)(xiii). As such, "participate in a Subscription sales model" means selling temporary access to a Recorded Books' Bundled Collection. That is not alleged here.

Second, Recorded Books' interpretation belies the provision's purpose. The provision prevents unauthorized injection of other publishers' content into Bundled Collections (of Recorded Books' content). As explained above, the middle sentence of Exhibit C, section 1(a), makes clear that "netLibrary and Recorded Books will allow other content providers to contribute content and to participate in this Subscription sales model on equivalent terms." Because "Subscription" is defined as selling Bundled Collections, it should be read as allowing other publishers to contribute to Recorded

16

Books' "Bundled Collections." To regulate that right, however, NetLibrary must obtain authorization before intermingling content. This focus on Bundled Collections is also supported by the Agreement's opening section, which states that "Exhibit C describes the business terms upon which Recorded Books and netLibrary have agreed to market, sell, and distribute Bundled Collections of Publisher Products." *Id.,* § 1.(d). There is no allegation that NetLibrary has allowed other publishers to contribute to a Bundled Collection, and thus, this section is not applicable.

Third, NetLibrary's "for purchase" agreements would not be prohibited even if "Subscription sales model" was not limited to Recorded Books' Bundled Collection. The non-defined meaning of "subscription" is "the payment of a flat fee in advance for the right to receive material for a set period of time." *E.g., Haley v. Nunda Township,* 2005 WL 94791, * 3 (Mich. App. 2005). It is different from ownership, which implies rights that are "general, permanent, and heritable." Black's Law Dictionary 1138 (8th ed. 2004). The cited agreements – with BCR and SOLINET – are both Purchase Agreements for ownership of licenses for certain book titles. *See* Wasinger Dec. ¶ 15, Exhibit 4 & 5 (attached thereto) (employing terms like "purchase," "one-time-only-fee," and "license"). Under the for-purchase models, libraries do not subscribe to pre-selected collections of books. *Id.* ¶ 12. Rather, each library owns the right to that e-audiobook. *Id.* Despite any shorthand that third parties may have inartfully used in marketing materials, NetLibrary was selling titles, not a "subscription" service. *Id.* ¶ 14.

### C. NetLibrary Did Not Breach Any Material Technical Requirement.

Recorded Books has no right to terminate the Agreement for alleged technical violations. There are more than 1,700 libraries with Subscriptions. Wasinger Dec. ¶ 20. Each library requires substantial technical performance. *Id.* ¶ 21. Of this, Recorded Books identifies only fifteen library complaints. *Id.* ¶¶ 20-21. Specifically, Recorded Books argues that NetLibrary breached its obligations regarding (1)

17

indexing and interface, (2) patron access, (3) MARC Records, (4) authentication process, (5) file size and download, and (6) access regarding Digital Rights Management.

Technical specifications are expressly governed by Exhibit B and Schedule B-1. Daehn Dec. ¶ 4. These provisions do not require 100% error-free performance, but rather obligate NetLibrary to "use reasonable commercial efforts" in providing e-audiobook subscription services. *Id.* ¶ 5. If NetLibrary had failed to perform a material technical requirement, which it did not, then it would have 60 days to cure the problem. *Agreement* §4(b). Factually, NetLibrary always performed in a commercially reasonable manner and, where resolution of non-material issues was necessary, resolved any issues within the 60 day cure period.[3] In any event, whether NetLibrary performed in a "commercially reasonable" manner is ultimately a question of fact to be decided by the jury; the technical questions presented in Recorded Books' motion do not lend themselves to preliminary analysis. *See Allora*, 2007 WL 1246448, at * 7 (question of fact could not be decided on preliminary injunction motion); *see also Shimamoto v. S&F Warehouses, Inc.*, 257 A.D.2d 334, 340 (N.Y. S. Ct. 1999) (commercial reasonableness was a question for jury).

     **(1)**    **Indexing**

Recorded Books alleges that NetLibrary has repeatedly failed to index selected titles. This is false. Nothing in the Agreement details how NetLibrary is to index titles, and thus, Recorded Books cannot terminate for any alleged issues with the indexing system. Daehn Dec. ¶ 8.

Nonetheless, patrons can browse titles at three access points (their library's catalog, the co-branded website, or the NetLibrary website) and by several different criteria (title, author name, key

---

[3] NetLibrary denies that Recorded Books gave a 60-day notice to cure. This is addressed on pages 22-23.

word in title, and subject). *Id.* ¶ 11. NetLibrary has indexed over 2,300 titles using a leading indexing product from an internationally recognized indexing software supplier. *Id.* ¶ 8-10.

NetLibrary's indexing system has worked without incident when browsing library catalogs or NetLibrary's website. *Id.* ¶ 12. A patron can also browse the co-branded website for author, title, or key word in title. The only issue raised was searching the *subject* field on the co-branded site.[4] *Id.* Recorded Books never provided a notice of breach in accordance with Paragraph 4, but Recorded Books' attorney noted indexing issues in his April 20, 2007 "letter of termination." Wasinger Dec. ¶ 16; Daehn Dec. ¶ 13. In quick response, NetLibrary expanded its browsing function to support "subject" field searches for the co-branded site by May 14, 2007. Daehn Dec. ¶ 12. Accordingly, NetLibrary delivered a commercially reasonable product and cured any perceived problem within 60 days. Daehn Dec. ¶ 12.

### (2) Patron Access

Recorded Books complains of patron access issues, although it neither identified any contractual provision that NetLibrary was allegedly violating nor provided any notice of breach as required. NetLibrary's access protocol is commercially reasonable. As described above, NetLibrary offers access via three access points (library catalogs, the NetLibrary website, and the co-branded website). *Id.* ¶ 11. Only a couple of incidents affected access and those were resolved promptly and professionally, and only temporarily made access a little more difficult - access has never been completely disrupted. *Id.* ¶¶ 15- 20. For example, Microsoft's roll out of a new Internet Explorer ("IE7") in January 2007 was one issue. *Id.* ¶ 16. There, the release of IE7 introduced security precautions that reset "ActiveX"

---

[4] Patrons could always browse by subject at their library's catalog. Since most Patrons start their searches at their library, the library catalog is usually the most used search portal. Daehn Dec. ¶ 12.

permission on the patron's browser to default settings, creating additional steps for patrons in downloading e-audiobooks, thus increasing download errors. *Id.* ¶ 17. NetLibrary resolved this issue within 60 days. *Id.* ¶¶ 18, 21 & Exhibit 1 (attached thereto) (confirmation resolution on February 22, 2007, of access issues). The other issue involved an expired Microsoft Windows Media Rights Management license for one of NetLibrary's servers. *Id.* ¶ 19. Although independent of the IE7 issue, it was a small issue that, like all other access issues, was resolved in a timely manner, and within 60 days. *Id.* ¶¶ 19, 21.

### (3)     MARC Records

NetLibrary provides "MARC" Records to subscribing libraries (for online catalog searches). *Id.* ¶¶ 22-23. Paragraph 3(c) of Schedule B-1 requires NetLibrary to provide Recipients with MARC Records. It does so. This process is handled by another division at OCLC. Daehn Dec. ¶ 24. OCLC's service is not only commercially reasonable, it is excellent. *Id.* The only issue claimed by Recorded Books results from MARC delivery and updates. *Id.* ¶ 25; Plaintiff's Brief, 9. These issues, NetLibrary discovered, were within the libraries' own control. Daehn Dec. ¶ 26. For example, some updates were being caught in libraries' spam filters. *Id.* Other emailed updates were inadvertently deleted by library personnel. *Id.* Although these issues do not directly involve NetLibrary's platform, and Recorded Books did not send a notice to cure, NetLibrary worked with libraries to create a more effective delivery system within 60 days. *Id.* ¶¶ 25-27; Wasinger Dec. ¶ 16. These efforts do not impugn the MARC Records or make the prior delivery system unreasonable. Daehn Dec. ¶ 26.

### (4)     Authentication

Authentication is the process of recognizing "authorized" library patrons. *Id.* ¶ 28. NetLibrary offers libraries several options for authentication, including IP address-based, secure-referring URL,

encrypted URL API, and NetLibrary username and password options that may be used alone or in combination by a library. *Id.* ¶ 29. In addition, NetLibrary has, at the request of Recorded Books, begun working with software vendors to make remote authentication possible. *Id.* ¶ 30. The only issue identified by Recorded Books involved beta-testing with a new remote authentication product at certain libraries.[5] *Id.* ¶ 31. While these libraries experienced some difficulty with the beta product, the problems were typical of any beta test and the libraries were aware of those risks going into testing. *Id.* Notably, Recorded Books never issued any notice to cure or identified any issues outside these limited circumstances. Wasinger Dec. ¶ 16; Daehn Dec. ¶¶ 31-32. Beta testing new improvements with willing participants does not qualify as a violation of the Agreement's technical specifications.

    **(5)    File Size**

Recorded Books claims that the fact that NetLibrary transmits for downloading each e-audiobook in a single file is a material breach. Daehn Dec. ¶ 34; Plaintiff's Brief, 10. Recorded Books would prefer that NetLibrary allow patrons to download e-audiobooks in parts (or chunks). This claim is both factually and legally baseless. Recorded Books cannot identify any provision of the Agreement obligating NetLibrary to limit the size of any file it delivers, nor did Recorded Books give any written notice to cure. Daehn Dec. ¶¶ 33-35. In fact, Recorded Books has refused to discuss new download methods with NetLibrary, in violation of Exhibit C, section 1.(d) of the Agreement. Daehn Dec. ¶ 34. While there are pros and cons to both approaches (single-file downloads vs. downloading in parts), NetLibrary selected its approach, at the time the Subscription service was launched and after much

---

    [5] Recorded Books' brief describes an access problem at the Iowa City and Baltimore Public Libraries. Plaintiff's Brief, 9, 11. That problem was related to this beta testing as well, and was fixed by the end of January 2007. Daehn Dec. ¶¶ 31, 38.

deliberation, based on its technical and commercial simplicity. *Id.* ¶ 34. Recorded Books' subsequent divergence of opinion does not suddenly make NetLibrary's choice commercially unreasonable.

**(6)    Digital Rights Management**

NetLibrary's "Digital Rights Management" (DRM) is reasonable and appropriate. *Id.* ¶¶ 36-37. DRM protects the e-audiobook from unauthorized uses, like sharing or copying. Schedule B-1(4)(b) to the Agreement outlines the DRM standards. *See also* Daehn Dec. ¶ 37. The Parties agreed to use Windows Media Player for DRM. *Id.* As required by the Agreement, the Windows Media Player prevents users from downloading more than three books, restricts checkout to 21 days, restricts CD burning, and prevents downloading to more than three other devices. *Id.*

In late 2004, Microsoft released Windows Media Player version 10.0. *Id.* Because that version will enforce a 21-day checkout, NetLibrary designed its platform to use that version. *Id.* In early 2005, the Parties discovered that almost no MP3 manufacturers were ready to support Windows Media Player 10.0. *Id.* In fact, all but three manufacturers used Windows Media Player version 9.0. *Id.* Version 9.0 does not enforce a 21-day checkout period. *Id.* To avoid launching a system for such a small number of supported devices, the Parties decided to enable downloads to customers with devices supporting only Windows Media Player 9.0, despite this limitation. *Id.* This took considerable retooling by NetLibrary, but the Parties agreed that it was more important to reach a wider market of customers than to enforce the 21-day checkout period. *Id.* The remaining DRM limitations are effective and, because of the sheer file size of each audiobook, few users would permanently retain an e-audiobook on a given device. *Id.* In any case, Recorded Books has never asked NetLibrary to disable downloads to version 9.0. *Id.* Nor did it send a notice to cure. *Id.*; Wasinger Dec. ¶ 16. Accordingly, it cannot seek to terminate the Agreement on these grounds.

**D.    Recorded Books Never Provided 60-Day Notice to Cure.**

Recorded Books is prohibited from terminating the Agreement because it failed to provide the required 60-day notice to cure.  New York law requires strict compliance with a termination provision. *See Filmline (Cross-Country) Productions, Inc. v. Yellowbill Finance, Ltd.* 865 F.2d 513, 519 (2d Cir. 1989) (applying the "clear New York rule requiring termination of a contract in accordance with its terms" and rejecting termination for failure to provide cure notice).  Section 4(b) provides that:

> Either party (the non-breaching party) may terminate this Agreement at any time after providing the other party with 60 days' prior written notice . . . unless the other party cures or remedies the event within the 60-day period following receipt of the written notice.

*Agreement*, § 4(b).  This written notice must be given in accordance with Section 11(i).  Recorded Books did not give any such notice.  Wasinger Dec. ¶ 16.  The attempted termination was ineffective.

**IV.    The Public Interest Favors NetLibrary.**

Recorded Books argues that public policy favors the copyright holder.  This is putting the cart before the horse. There is no copyright claim until Recorded Books has proved it was justified in terminating the Agreement.  In this regard, the public interest cuts in NetLibrary's favor.  "There is, after all, a clear public interest in seeing that parties' legitimate expectations, as defined by mutually agreed upon contract terms, are met." *Hoffman v. Empire Blue Cross & Blue Shield,* 1999 WL 782518, at *5 n.2 (S.D.N.Y. 1999).  This is especially true where, as here, a party is simply seeking to enforce the terms of its bargained-for Agreement.  Moreover, helping NetLibrary is in the public interest. NetLibrary is a division of OCLC.  For over 50 years, OCLC has helped over 57,000 libraries expand their services and provide affordable access to information.  Wasinger Dec. ¶ 3.  By allowing NetLibrary to continue under the terms of its bargained-for Agreement, the Court would allow NetLibrary to

continue to serve libraries and their patrons around the world to continue to receive Subscription Services.

## **CONCLUSION**

For the foregoing reasons, NetLibrary requests that the Court deny Recorded Books' Motion for Preliminary injunction.

Dated this 6th day of July, 2007.

Respectfully submitted,

_____
Hugh J. Marbury (Fed. Bar No. 24653)
DLA Piper US LLP
6225 Smith Avenue
Baltimore, Maryland  21209
410-580-3000
410-580-3001 (facsimile)

Attorneys for OCLC Online Computer Library
Center, Inc., d/b/a NetLibrary

*Of Counsel, Pro Hac Vice*

Randall H. Miller, Esq.
Eve Burton, Esq.
Jason Prussman, Esq.
HOLME ROBERTS & OWEN LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado  80203-4541
303-861-7000
303-866-0200 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 6th day of July, 2007, a true and correct copy of the foregoing **DEFENDANT NETLIBRARY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** was filed and served electronically as follows:

David L. Permut
GOODWIN PROCTER LLP
901 New York Avenue, NW
Washington, DC  20001

R. David Hosp
Jaren D. Wilcoxon
Robert D. Carroll
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109

_____
Hugh J. Marbury