IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| RECORDED BOOKS, LLC<br><br>    Plaintiff/Counter<br>    Defendant,<br><br>v.<br><br>OCLC ONLINE COMPUTER LIBRARY CENTER, INC. d/b/a NETLIBRARY,<br><br>    Defendant/Counter<br>    Plaintiff. | Case No. 07 CV 1427 (DKC) |

**DECLARATION OF JAMES P. DAEHN IN OPPOSITION
TO PLAINTIFF RECORDED BOOKS LLC'S MOTION FOR PRELIMINARY INJUNCTION**

I, James P. Daehn, hereby declare and state:

1. I am employed by NetLibrary and have been with the company since 2000. My current position is Director of Information Technology. In that role, among other things, I manage the software development group and oversee the development of all components of NetLibrary's e-audiobook hosting platform.

2. I have substantial experience in the development and oversight of software and other technical systems. Since 1997, I have worked extensively with computer and Internet graphics, metadata, search engines and records indexing.

3. I am familiar with NetLibrary's eContent Production and Distribution Agreement ("Agreement") with Recorded Books. I oversee NetLibrary's software development, quality assurance, and product management teams.

4.	All of NetLibrary's technical and customer service obligations are governed by Exhibit B to the Agreement and the attached schedule, B-1, including all specifications and guidelines regarding: (1) Indexing; (2) Patron Access; (3) MARC Records; (4) Patron Authentication; (5) File Downloads; and (6) Digital Rights Management, or "DRM."

5.	Nothing in either Exhibit B or Schedule B-1 requires a 100% error-free performance. Rather, NetLibrary is required only to use "reasonable commercial efforts" in providing e-audiobook subscription services.

6.	If NetLibrary ever failed to use "reasonable commercial efforts" in performing its obligations or if NetLibrary otherwise failed to perform a material technical requirement, Recorded Books was required to give written notice to NetLibrary of any such failure and NetLibrary was to be given sixty days to fix the problem.

**I.	Indexing**

7.	The term "indexing" refers to the ability of a library patron to search for e-audiobooks by title or some other criterion.

8.	Nothing in the Agreement requires NetLibrary to "index" Recorded Books' e-audiobooks. Nevertheless, NetLibrary has indexed over 2,300 e-audiobook titles and made them searchable by title, author name, key word, and subject.

9.	NetLibrary acquired its indexing function through a product purchased from Autonomy, Inc., which is an internationally recognized market leader in the field of companies that structure and develop search capabilities for databases. NetLibrary made its purchase through Autonomy following a widely circulated Request for Proposals, which allowed NetLibrary to vet bids from several prominent firms.

10. NetLibrary indexes every title that is included in the Recorded Books/NetLibrary "Bundled Collection," and does so shortly after Recorded Books submits an e-audiobook title to NetLibrary for processing.

11. As a result of NetLibrary's indexing process, patrons can search or browse for e-audiobooks by title, key word, author, and subject, and can do so through the following access points: (1) a library's online card catalog (pursuant to "MARC" Records, or machine-readable cataloging records, which NetLibrary provides to libraries); (2) the co-branded NetLibrary/Recorded books website; and (3) NetLibrary's own website.

12. NetLibrary's indexing system has worked without incident for all searches performed through libraries and through NetLibrary's own website. For a short time, however, searches performed on the parties' co-branded website using the *subject* field may not have yielded the same result as a search using the *subject* field when performed through a library's website or through NetLibrary's own website. Searches made on the co-branded website rely on a different database than do searches made through library catalogs or NetLibrary's website. During the period between November 2006 and May 2007, there were some delays in getting information loaded into the co-branded website's *subject* database. That issue, however, was minor and in no way affected patrons' ability to search for titles through the other two access points (library catalogs and NetLibrary's own website). Likewise, this issue in no way materially affected patrons' ability to search on the parties' co-branded website, since searches made using author, title, and key word worked uninterrupted. Moreover, the *subject* searching issue affected very few patrons; the vast majority of patrons start their searches for e-audiobooks through their respective libraries' websites. In any event, by May 14, 2007, NetLibrary had completed

substantial coding changes to the NetLibrary/Recorded Books website and searches by *subject* have been seamless on that website ever since.

13.     NetLibrary never received a written notice purporting to terminate the Agreement because of NetLibrary's indexing function and never received a notice directing NetLibrary to cure any such issues within sixty days.

## II.     Patron Access

14.     Section 2.(a) of Exhibit B to the Agreement states that "netLibrary and Recorded Books have agreed to grant access to Authenticate Patrons of [libraries] that purchase the Recorded Books/netLibrary Audio Book offering." "Access" generally refers to the ability of library patrons to search out and download e-audiobooks through the Internet. The Agreement requires NetLibrary to make e-audiobooks downloadable as a Windows Media Audio ("WMA") file, which is supported by and playable on a variety of software programs, including Windows Media Player. Most patrons complete downloads to Windows Media Player and use Internet Explorer to do so.

15.     NetLibrary has provided uninterrupted e-audiobook access to patrons since the inception of the NetLibrary/Recorded Books subscription program in early 2005.

16.     In late January 2007, NetLibrary became aware of one download issue involving Internet Explorer version 7.0 ("IE7") and Windows Media Player. The issue was unrelated to NetLibrary's "Access" obligations.

17.     Microsoft's Windows Media Rights Management Software Development Kit requires end-users to authorize the operation of the "ActiveX" controller before downloads using Internet Explorer can be completed. "ActiveX" refers to a set of rules for how software applications share information. Versions of Internet Explorer before IE7 automatically downloaded the controls for

4

ActiveX and did not require end-users to manually set these controls. IE7, however, did not automatically download the ActiveX controls for end-users, because downloads using the ActiveX control can be dangerous. Instead, IE7 introduced new safeguards to protect users of Internet Explorer from ActiveX controls, including prompting end-users to manually set the necessary ActiveX controls. Thus, for patrons attempting to download e-audiobooks through IE7, there were additional steps that had to be completed before downloading an e-audiobook. Such additional steps increased the likelihood that end-users would not follow download instructions and temporarily contributed to a higher incidence of users' inability to successfully complete an e-audiobook download.

18.  NetLibrary became aware of the ActiveX issue in late January 2007, just after IE7 went into wide release. By mid-February, NetLibrary took proactive steps to make downloading through IE7 easier. Importantly, NetLibrary instructed all subscribing libraries to download the ActiveX controls on all of their computer terminals so that patrons would not have to set up ActiveX themselves at the time of download. For patrons using their own computers for downloads, NetLibrary also provided conspicuous instructions and alerts so that they would know to turn on the ActiveX settings prior to downloading. These measures have effectively eliminated the problems that patrons were experiencing with IE7 and have increased the ease with which patrons are able to download e-audiobooks through IE7.

19.  The other access issue involved an expired Microsoft Windows Media Rights Management license on one of the Internet servers that NetLibrary used to issue Windows Media Player licenses (required for downloads). This issue was independent of the IE7 ActiveX issue, but it was identified quickly and resolved promptly, within sixty days.

20.  Thus, not only has NetLibrary provided seamless access to e-audiobooks since the inception of the subscription program, it has been proactive in ensuring that patrons' ability to download e-audiobooks is as obstacle-free as possible. There is no requirement in the Agreement that NetLibrary resolve patron issues like these, which are wholly unrelated to NetLibrary's own applications. NetLibrary, however, has gone beyond the terms of the Agreement to provide excellent service for libraries and their patrons.

21.  NetLibrary never received a written notice purporting to terminate the Agreement because of access issues and never received notice directing NetLibrary to cure any such issues within sixty days. To the contrary, NetLibrary received written confirmation on February 22, 2007, from Recorded Books that all access issues had been resolved. A true and correct copy of an email, received, sent and kept in the course of ordinary business, and reflecting that confirmation, is attached hereto as Exhibit 1.

### III.  MARC Records

22.  Under section 3(c) of Schedule B-1 to the Agreement (the "Technical Specifications" portion), NetLibrary agreed to "provide [libraries] that purchase the Recorded Books/netLibrary Audio Book offering with MARC Records for all Audio Books in the offering at no additional charge." MARC Records are sent to libraries, which use the records to update their online card catalogs. An e-audiobook MARC Record signals to library patrons, via the library's online card catalog, whether or not a certain book is available in e-audiobook format and whether it is available for check-out.

23.  Completing a MARC Record is a process that NetLibrary performs every time Recorded Books adds e-audiobooks to a Bundled Collection. NetLibrary completes the MARC Record process in parallel with the creation of an e-audiobook's indexing record. This near-simultaneous process helps to

make sure that end-users can search out any title in the parties' Bundled Collection shortly after that title becomes part of the parties' Bundled Collection.

24. NetLibrary's MARC Records process is handled by another division at OCLC. As NetLibrary loads new e-audiobooks submitted by Recorded Books to its servers, it sends the information necessary to create the MARC Record to OCLC, and OCLC creates the MARC Record for the e-audiobook. Once per month – usually around the 25th of each month – OCLC updates the standing order for each e-audiobook collection to which titles have been added and OCLC notifies every library with an active subscription to these e-audiobook collections that they can now contact OCLC to receive an update to its MARC Record set for the new MARC Records. Not only is OCLC's MARC Records process commercially reasonable, it is excellent. In fact, Recorded Books has a separate agreement with OCLC to supply MARC Records for Recorded Books' video initiative.

25. Any delays in the MARC Records process are attributable either to the way Recorded Books submits e-audiobooks to NetLibrary for processing or the gap in time between NetLibrary's sending notice to the library of the new MARC Record's availability and the library's ability to get the record into its database.

26. OCLC's MARC records process continues to be commercially reasonable and OCLC continues to find ways to improve the process. After investigating complaints about the MARC Records process lodged by Recorded Books, NetLibrary discovered that several factors in these complaints were all within libraries' own control. For instance, NetLibrary became aware that some MARC Records updates sent via e-mail were getting caught in libraries' e-mail spam filters and other emailed updates were inadvertently deleted or ignored by library personnel. At NetLibrary's request, OCLC changed the subject line of the MARC Records email to avoid spam filters and changed the identity of the email

sender to reduce the likelihood that emailed updates would be inadvertently deleted or ignored by library personnel. Although neither issue directly relates to NetLibrary's performance, and Recorded Books never sent a notice to cure, NetLibrary worked with libraries to create a more effective delivery system within 60 days. This does not mean that its MARC process is or was commercially unreasonable.

27.    NetLibrary never received a written notice purporting to terminate the Agreement because of its MARC Records process and it never received a notice directing NetLibrary to cure any such issues within sixty days.

### IV.    Patron Authentication

28.    While section 2.(a) of Exhibit B to the Agreement states that "netLibrary and Recorded Books have agreed to grant access to Authenticate Patrons of [library] that purchase the Recorded Books/netLibrary Audio Book offering," there is no explicit requirement in the Agreement detailing how patrons are to be authenticated for libraries. "Authentication" generally refers to the process by which an automated system – either NetLibrary's or a library's - can verify whether patrons are authorized to download e-audiobooks.

29.    NetLibrary offers several authentication processes that Libraries can use to authenticate patrons to the NetLibrary System. These processes include IP Address-based, secure referring URL, encrypted URL API and NetLibrary username and password options that may be used singly or in combination by a library. These authentication processes are reliable, stable, and timely and are standard processes used by companies in the Internet industry to manage user authentication. These authentication processes are also the authentication processes that NetLibrary offers to every library that purchases eContent from NetLibrary. At present, there are over 15,000 libraries using one or more of these authentication processes to access eContent that they have acquired from NetLibrary. These

authentication processes satisfy NetLibrary's obligation to provide a system that authenticates Library Patrons for access to e-audiobook Collections.

30. Recorded Books has asked NetLibrary to develop a "streamlined" remote authentication process so that patrons accessing e-audiobooks through their library's system only have to enter their login information once during the process. NetLibrary has agreed to develop such a process, even though there is no such requirement in the Agreement. To this end, NetLibrary began beta-testing a remote authentication product from a third-party vendor with the Iowa City Public Library ("Iowa City").

31. Everyone involved in the Iowa City beta testing was aware of the technical challenges that beta-testing in general presented, and unfortunately the testing did cause some temporary problems for Iowa City. Specifically, some patrons were asked to re-enter their login information during particularly long login sessions. Iowa City's login issue was addressed and quickly fixed within 60 days. Iowa City and several other libraries now enjoy a functioning remote authentication process.

32. NetLibrary never received a written notice purporting to terminate the Agreement because of authentication issues and never received a notice directing NetLibrary to cure any such issues within sixty days.

**V.    File Downloads**

33. The Agreement contains no provision obligating NetLibrary to limit the size of the WMA file that it delivers to patrons for downloading.

34. After much deliberation, NetLibrary adopted a method of transmission where the end-user would download the entire WMA file – or the entire e-audiobook - at the time of checkout, rather than downloading the book in parts. NetLibrary recognizes that there are certain advantages and

9

disadvantages to both methods of file downloading, and NetLibrary continues to weigh those advantages against its current transmission method. Both Recorded Books and NetLibrary deemed the single-file download method appropriate because it allowed the parties to get e-audiobooks to market sooner. Nevertheless, NetLibrary constantly strives to improve its service and continues to re-evaluate its transmission and download process to determine what method is most convenient for end-users. Despite NetLibrary's invitation to Recorded Books to discuss new download methods, Recorded Books has refused to discuss the matter.

35. NetLibrary never received a written notice purporting to terminate the Agreement because of issues related to file size and never received a notice directing NetLibrary to cure any such issues within sixty days.

**VI.   Digital Rights Management**

36. NetLibrary's platform includes a mechanism for Digital Rights Management (DRM). DRM protects unauthorized uses. Section 4(b) of Schedule B-1 to the Agreement lists the standards under which NetLibrary is to handle "Digital Rights Management" or DRM for Recorded Books' e-audiobook titles. Section 4(b) states that DRM will be engaged to: (1) limit the number of titles that can be checked out at one time by a single patron; (2) to restrict the checkout period to 21 days; (3) restrict burning of titles to CDs; and (4) to restrict the number transfers of e-audiobooks that can be made from one device to another to three. *Agreement,* Schedule B-1, § 4(b)(i) – (iv).

37. DRM protects the e-audiobook from unauthorized uses, like sharing or copying. Schedule B-1(4)(b) to the Agreement outlines the DRM standards. The Parties agreed to use Windows Media Player for DRM. As required by the Agreement, the Windows Media Player prevents users from downloading more than three books, restricts checkout to 21 days, restricts CD burning, and prevents

downloading to more than three other devices. In late 2004, Microsoft released Windows Media Player version 10.0. Because that version will enforce a 21-day checkout, NetLibrary designed its platform to use that version. In early 2005, the Parties discovered that almost no MP3 manufacturers were ready to support Windows Media Player 10.0. In fact, all but three manufacturers used Windows Media Player version 9.0. Version 9.0 does not enforce a 21-day checkout period. To avoid launching a system for such a small number of supported devices, the Parties decided to enable downloads to customers with devices supporting only Windows Media Player 9.0, despite this limitation. This took considerable retooling by NetLibrary, but the Parties agreed that it was more important to reach a wider market of customers than to enforce the 21-day checkout period. The remaining DRM limitations are effective and, because of the sheer file size of each audiobook, few users would permanently retain an e-audiobook on a given device. In any case, Recorded Books has never asked NetLibrary to disable downloads to version 9.0. Likewise, NetLibrary never received a written notice purporting to terminate the Agreement because of DRM issues and never received a notice directing NetLibrary to cure any such issues within sixty days.

### VII.  Baltimore County Public Library

38.   In January 2007, Baltimore County Public Library ("BCPL") posted a notice on its website stating that there was a problem downloading NetLibrary e-audiobooks. BCPL's download difficulties related in part to the ActiveX issue, which, as explained above, was resolved by mid-February 2007. BCPL's issues also may have related to the expired Windows Media Rights Management license, which, again, was resolved promptly and within sixty days. BCPL was also an authentication service beta customer. Like Iowa City, any beta issues were foreseeable and agreed to by

all parties and have been fully resolved, within sixty days. All of BCPL's download difficulties were addressed and fixed by mid-May 2007.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 6, 2007.

*James P. Daehn*
James P. Daehn