IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
RECORDED BOOKS, LLC,                      Civil Action No. 8:07-cv-01427-DKC
:
          Plaintiff,
:   **REPLY MEMORANDUM IN**
    v.                                      **SUPPORT OF PLAINTIFF**
:   **RECORDED BOOKS, LLC'S**
OCLC ONLINE COMPUTER LIBRARY              **MOTION FOR PRELIMINARY**
CENTER, INC. d/b/a NETLIBRARY,        :   **INJUNCTION**

          Defendant.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiff Recorded Books, LLC ("Recorded Books") hereby submits this reply memorandum in support of its motion for entry of a preliminary injunction against defendant OCLC Online Computer Library Center, Inc. d/b/a NetLibrary ("NetLibrary").

## INTRODUCTION

      In its response to Recorded Books' motion for preliminary injunction ("Response"), NetLibrary does not dispute that it is currently marketing, distributing, and selling to libraries digital electronic versions of audiobooks that can be downloaded via the Internet from publishers other than Recorded Books. Moreover, there is no dispute that these third-party publishers have not been added to the eContent Production and Distribution Agreement between NetLibrary and Recorded Books (the "Agreement"). Faced with the inescapable reality that this violates the Exclusivity Provision in the Agreement—and also triggers Recorded Books' right to terminate—NetLibrary embarks on a byzantine (and often deceptive) analysis of the Agreement's language, urging this Court to reach the nonsensical conclusion that the Exclusivity Provision only prohibits NetLibrary from entering into separate agreements with <u>non-Recorded Books publishers</u> to distribute <u>Recorded Books</u> works.

But NetLibrary's tortured construction—which relies on defined terms that do not exist and extrinsic evidence that post-dates the Agreement—flies in the face of logic, common sense, and, most important, the clear language of the Agreement. Under the unambiguous terms of the Agreement, NetLibrary was not permitted to distribute audiobooks from any publisher other than Recorded Books—regardless whether NetLibrary chose to use the label "subscription agreement," "for purchase agreement," or something else—unless those publishers were added as parties to the Agreement. As a result, for the reasons stated in its opening memorandum, Recorded Books was well within its rights to terminate the Agreement, and any further distribution of Recorded Books' content by NetLibrary (beyond what is expressly allowed under the wind-down provisions of the Agreement) constitutes copyright infringement, unfair competition, and breach of contract.

NetLibrary's remaining arguments in opposition to a preliminary injunction are equally unavailing. For example, NetLibrary's efforts to dispute Recorded Books' claims concerning NetLibrary's performance of its technical obligations under the Agreement also fail. Although Recorded Books may not have specifically used the word "breach" or referenced the termination provisions of the Agreement in notifying NetLibrary of its repeated deficiencies, the Agreement did not require Recorded Books to use any magic words to trigger the sixty-day cure period. As set forth in the scores of e-mails submitted with this reply, Recorded Books repeatedly provided "60 days' prior written notice of the occurrence" of material violations of the Agreement, and in many instances NetLibrary failed to satisfactorily respond at all, never mind within sixty days.

Likewise, NetLibrary misstates the law when it says that there is no presumption of irreparable harm from copyright infringement where the parties also have a contractual relationship. The truth is that NetLibrary's conduct after Recorded Books terminated the

Agreement constitutes copyright infringement, plain and simple, and the presumption of irreparable harm applies just as it would if there was no contract.  In any event, NetLibrary fails to mention that the Agreement itself specifically provides for injunctive relief "to enjoin or restrain the breaching party."  Moreover, because the parties agreed to a broad "Limitation on Damages" provision for breaches of the Agreement, Recorded Books has no adequate remedy at law for NetLibrary's ongoing unlawful conduct.  In any event, Recorded Books has established that it will suffer irreparable harm in the absence of an injunction, and NetLibrary has failed to show that it will suffer irreparable harm if the injunction is granted.

## ARGUMENT

**I.    NetLibrary's Tortured Construction of the Exclusivity Provision Ignores the Plain Language of That Provision.**

The Exclusivity Provision, § 1(a) of Exhibit C to the Agreement, states in its entirety:

> The Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet.  The Subscription sales model described in this Agreement is the exclusive means by which Recorded Books will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet.  netLibrary and Recorded Books will allow other content providers to contribute content and to participate in this Subscription sales model on equivalent terms.  If, without Recorded Books' consent, netLibrary signs an Agreement to allow another content provider to contribute Audio Book content and to participate in a Subscription sales model to which Recorded Books is not a party; then, subject to Section 1.(e) of Exhibit B, Recorded Books may give netLibrary written notice terminating this Agreement immediately.

Agreement, Exhibit C, § 1(a) (attached as Exhibit A to the Declaration of Brian T. Downing in Support of Plaintiff Recorded Books, LLC's Motion for Preliminary Injunction, dated June 19, 2007 ("Downing Dec.")) (emphasis added).

This straightforward language contains two interrelated prohibitions, neither of which is unclear: First, both NetLibrary and Recorded Books agreed that they would not market, distribute, or sell "Audio Books" via the Internet except as provided for in the Agreement. Second, if NetLibrary entered into a separate agreement to allow libraries to purchase subscriptions to "Audio Book content" from publishers other than Recorded Books, then Recorded Books could terminate the Agreement immediately.

Despite this easy-to-understand language, NetLibrary relies on subject headings, defined terms, and the "stated purpose of the Agreement," all located in other parts of the Agreement, to try to convince this Court that the Exclusivity Provision "governs only the treatment of Bundled Collections of *Recorded Books'* content." Response at 13-14 (emphasis in original). NetLibrary goes on to state that

> the only way NetLibrary can sell Recorded Books' audiobook content is by the "Subscription sale [sic] model." It [the Exclusivity Provision] is not referring to other publishers' products. Here, the only way NetLibrary is distributing Recorded Books' content is through the Subscription sales model. The "for purchase" model is only for non-Recorded Books content. Therefore, this provision is inapplicable.

*Id.* at 14-15.

NetLibrary's analysis makes no sense. While Recorded Books agrees that the "Subscription sales model described in th[e] Agreement" <u>authorized</u> NetLibrary to distribute only "Bundled Collections of Recorded Books' content," the unambiguous language of the Exclusivity Provision <u>prohibited</u> any other marketing, distribution, or sale of any other "Audio Books" that were not covered by the "Subscription sales model." As a result, the Exclusivity Provision plainly forbid NetLibrary from marketing, distributing, or selling <u>any</u> "Audio Books,"

4

including "Audio Books" from other publishers, except Recorded Books titles that were part of the "Bundled Collection."[1]

Contrary to NetLibrary's argument, Response at 15 (referring to Agreement, Exhibit C, §§ 1(a) and 2(a)(iii)), the other parts of the Agreement that referred to "other content providers" and "other publishers" do not contradict this analysis. Rather, they simply allowed for mechanisms by which Recorded Books and NetLibrary could jointly agree to allow "other content providers" to "participate" in "<u>this</u> Subscription sales model," either on "equivalent terms" or, if they later agreed otherwise, on "different terms." Agreement, Exhibit C, §§ 1(a) and 2(a)(iii) (emphasis added). Thus, when all of these clauses are read together, this is the most reasonable interpretation. *See Random House, Inc. v. Rosetta Books LLC*, 150 F. Supp. 2d 613, 620 (S.D.N.Y. 2001). Indeed, reading these clauses as somehow giving NetLibrary carte blanche unilaterally to enter into new agreements with "other content providers" that are outside of the "Subscription sales model described in th[e] Agreement" would cause the Exclusivity Provision to be "rendered meaningless," Response at 15, contrary to the canons of statutory construction on which NetLibrary relies so heavily.

Beyond its failed textual argument, NetLibrary claims that "a global exclusivity provision would be inconsistent with NetLibrary's nonprofit status." *Id.* To support this claim, NetLibrary

---

[1] To support its strained construction, NetLibrary deceptively claims that "[t]he term Audio Book also <u>appears</u> to be a defined term" that is limited to Recorded Books works. Response at 14 n.2 (emphasis added). But the actual defined term is "Audio Book File," which referred to a digital file format "that meets netLibrary's file format specifications" (e.g., MP3, WMA, WAV, CD, or DVD), and was used in comparison to a "Third-Party File," which referred to a digital file format "that is not consistent with the applicable netLibrary file format specification." *See* Agreement, §§ 2(a)(ii) and (xvi) and Exhibit A, § 1(a) (allowing Recorded Books to "deliver Publisher Products to netLibrary in any of the following formats: (1) an Audio Book File or (2) a Third-Party File, or (3) a format mutually agreed upon by the parties."). The term "Audio Book" was used interchangeably in the Agreement with the term "audiobook" and was <u>not</u> a defined term. Accordingly, it should be given its ordinary meaning and should not be construed as limited to Recorded Books works. For purposes of this motion, Recorded Books adopts the definition in NetLibrary's response and the Wasinger Declaration. *See* Response at 3; Declaration of Scott Wasinger in Opposition to Plaintiff Recorded Books LLC's Motion for Preliminary Injunction, dated July 6, 2007 ("Wasinger Dec."), ¶ 4 ("Audiobooks are recordings of books read aloud.").

refers to a single e-mail that it sent to Recorded Books in February 2005, nearly six months <u>after</u> it entered into the Agreement. *Id.*; Wasinger Dec. ¶ 9 and Exhibit 2. For several reasons, this argument is of no help to NetLibrary.

First, the Agreement allowed NetLibrary to distribute content from other content providers—as long as those other content providers were properly added to the Agreement. Nothing about this arrangement would offend NetLibrary's non-profit mission. Second, as a matter of law and fundamental fairness, even if the Agreement (which NetLibrary willingly entered into) conflicted with NetLibrary's mission (which it did not), Recorded Books should not be denied the benefit of its bargain simply because of NetLibrary's after-the-fact buyer's remorse. *See* 1 Richard A. Lord, *Williston on Contracts* § 1:1 (4th ed. 1990 & Supp. 2007). Third, NetLibrary's e-mail actually demonstrates that NetLibrary was willing to agree to the Exclusivity Provision in exchange for obtaining the benefits of having access to Recorded Books' content: "We absolutely believe we're currently working with the best <u>which is why we dropped our other initiatives last spring to pursue this agreement with you</u>…." Wasinger Dec., Exhibit 2 (emphasis added). And while NetLibrary went on to state that its "charter dictates that we look at all possible opportunities and avenues for aggregating content," it acknowledged at the time that it would require Recorded Books' consent to offer content from other publishers; otherwise it would risk having the Agreement be terminated: "Because of the value we know you bring, we are anxious to first have discussions about any other publishers and any other audio content." *Id.*[2]

---

[2] In any event, it is hornbook law that extrinsic evidence cannot be used to contradict an unambiguous contractual provision. *See, e.g.*, *Black v. N.Y. State & Local Employees' Retirement Sys.*, 818 N.Y.S.2d 640, 641-42 (N.Y. App. Div. 2006). Thus, because the meaning of the Exclusivity Provision is clear on its face, the Court should limit its analysis to the language itself, and should not be influenced by NetLibrary's self-serving references to its "mission."

Recorded Books' interpretation of the Exclusivity Provision is the only one that makes sense: Put simply, NetLibrary was prohibited under the plain terms of the Agreement from marketing, distributing, or selling to libraries <u>any</u> audiobook content other than the "Bundled Collection" of Recorded Books works, unless the other content providers were properly added to the Agreement. NetLibrary acknowledges that in 2007 it "began to sell single titles of other e-audiobooks to libraries," Response at 3, and there is no dispute that the publishers of these audiobooks were not "participat[ing] in <u>this</u> Subscription sales model." Agreement, Exhibit C, § 1(a) (emphasis added). Accordingly, by its own admission, NetLibrary violated the Exclusivity Provision.

## II. Regardless of the Self-Serving Labels NetLibrary Uses, Its Agreements with Other Publishers Constitute Agreements "to Participate in a Subscription Sales Model to which Recorded Books Is Not a Party."

As set forth in detail in Recorded Books' opening memorandum, it is also clear that NetLibrary has, without Recorded Books' consent, entered into agreements with other content providers to participate in "Subscription sales model[s]" to which Recorded Books is not a party.[3] Although NetLibrary tries to distinguish its so-called "for purchase" agreements from "subscription" agreements by asserting that its customers pay a one-time fee for access to audiobooks that is "general, permanent, and heritable," Response at 4, 17 (quoting Black's Law Dictionary 1138 (8th ed. 2004)), a review of the relevant contracts confirms that is not how those arrangements work.

---

[3] As set forth above, NetLibrary has breached the Exclusivity Provision of the Agreement, regardless whether its Internet-based distribution of other publishers' works is a "subscription," a "sale," or anything else. The Exclusivity Provision plainly states that "[t]he Subscription sales model described in this Agreement is the exclusive means by which netLibrary will market, distribute, and sell to Recipients digital electronic versions of Audio Books that can be downloaded via the Internet." Agreement, Exhibit C, § 1(a). NetLibrary concedes, as it must, that it is distributing the works of other publishers via the Internet. Response at 3-4. Whether one calls that distribution a subscription model or a for-purchase model, NetLibrary has violated the Exclusivity Provision and breached the Agreement.

NetLibrary is correct that the "for purchase" agreements with BCR, SOLINET, and the St. Paul Public Library require libraries to pay a "one-time-only fee" to gain access to audiobook content, but it ignores that they must also pay a separate, annual fee to continue to receive access to the works for one-year time periods. *See, e.g.*, Consortium Agreement for Audio Book Purchases between NetLibrary and Bibliographical Center for Research ("BCR Agreement"), Exhibit A, §§ A.1, A.2, B.1, and B.2 (Wasinger Dec., Exhibit 4).[4] This fee, referred to as an "Annual Platform Fee," is calculated based on the number of books that are available in the library's database (regardless whether the database is unique to the library, in the case of the St. Paul Public Library, or is shared, in the case of BCR and SOLINET). *Id.* Exhibit A, § B.1. If the customer fails to pay its Annual Platform Fee, the contract may be terminated and NetLibrary's obligation to provide continued access to the audiobooks ceases. *Id.* § II.A.2 (authorizing NetLibrary to terminate for failure to pay fees); Exhibit A, § C.1.d ("NetLibrary will provide Platform Services [defined as the "ongoing access to and use of Audio Books or Subscription(s) to Audio Books via the Internet"] for as long as Consortium continues to pay the Platform Fee"); Exhibit A, § C.1.f ("[I]f NetLibrary terminates this Agreement for cause under Section II.A.2 of the Agreement, then NetLibrary's obligation to provide Audio Books and Platform Services will expire."). Thus, like any other "subscription" agreement, customers who have entered into a so-called "for purchase" agreement with NetLibrary must pay an annual fee "in advance for the right to receive material for a set period of time." Response at 17 (defining "subscription").[5]

---

[4] NetLibrary's contracts with the St. Paul Public Library and SOLINET are identical to the BCR Agreement in all relevant respects. *See* Wasinger Dec., Exhibits 3 and 5.

[5] NetLibrary again misrepresents the definitions contained in the Agreement when it states, "'Subscription sales model' is defined as temporary access to Bundled Collections of Recorded Books' content." Response at 16. In fact, "Subscription sales model" is not defined in the Agreement—only "Subscription" is a defined term. *See* Agreement, § 2(a)(xiii). Moreover, when NetLibrary believes it suits its cause not to rely on the definitions contained in the Agreement, it is happy to ignore them and rely on a different definition. *See*

8

In sum, NetLibrary cannot avoid the consequences of entering into alternative subscription agreements simply by coming up with a different name for them. Because NetLibrary has, without Recorded Books' consent, signed an "Agreement to allow another content provider to participate in a Subscription sales model to which Recorded Books is not a party," Recorded Books was entitled immediately to terminate the Agreement.[6]

In its Response, NetLibrary asserts that "the Agreement allows termination only for unauthorized contribution to a 'Subscription sales model' involving Bundled Collections of Recorded Books' content." *Id.* at 16. Once again, NetLibrary's construction of the Exclusivity Provision is nonsensical. Under NetLibrary's twisted interpretation, the only thing that NetLibrary is prohibited from doing is entering into a different agreement with a <u>non-Recorded Books publisher</u> to sell subscriptions to <u>Recorded Books</u> works. *Id.* at 16 ("As such, 'participate in a Subscription sales model' means selling temporary access to a Recorded Books' [sic] Bundled Collection. That is not alleged here."). But neither the plain language of the Agreement nor common sense supports such an interpretation. Indeed, absent some sort of exclusive sublicensing arrangement between Recorded Books and another publisher—to which Recorded Books has not and would not agree—it would be legally impossible for NetLibrary to enter into an agreement with "another content provider" to sell subscriptions to Recorded Books works. Thus, NetLibrary's interpretation would once again cause the Exclusivity Provision to be "rendered meaningless," *id.* at 15, contrary to established rules of contract interpretation. *See,*

---

Response at 17 ("The non-defined meaning of 'subscription' is 'the payment of a flat fee in advance for the right to receive material for a set period of time.'").

[6] NetLibrary does not dispute—and implicitly concedes—that if the Agreement was properly terminated, it has engaged in copyright infringement, unfair competition, and breach of contract. *See* Response at 12 and n.1. Accordingly, because the termination was proper, Recorded Books is likely to succeed on the merits of all of its claims.

*e.g.*, *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 562 N.Y.S.2d 613, 614 (N.Y. App. Div. 1990), *appeal denied by* 572 N.E.2d 52 (N.Y. 1991).

**III.    Recorded Books Provided Adequate Notice to NetLibrary Regarding Its Many Deficiencies.**

NetLibrary has violated the Exclusivity Provision of the Agreement, which gives Recorded Books the right to terminate immediately. *See* Agreement, Ex. C, § 1(a). Therefore, Recorded Books was not required to provide NetLibrary with notice, and its termination of the Agreement was lawful and effective.

However, in scores of e-mails and in numerous meetings, Recorded Books provided adequate notice to NetLibrary regarding the many deficiencies in NetLibrary's performance of the technical requirements of the Agreement. For example, in meetings with NetLibrary, Recorded Books explicitly set forth a number of technical issues, identifying problems that clearly amount to breaches of the Agreement. *See* Second Declaration of Brian T. Downing in Support of Recorded Books, LLC's Motion for Preliminary Injunction, dated July 12, 2007 ("Second Downing Dec."), ¶¶ 2-3 and Exhibits A and B. On February 19, 2007—sixty days before the letter terminating the Agreement—Recorded Books had a discussion with NetLibrary in which Recorded Books told NetLibrary "the extent of the problems" and referred to a "deficiencies list." *Id.* ¶ 4 and Exhibit C. On February 22, 2007, Recorded Books then sent a detailed list of these issues. *Id.* ¶ 5 and Exhibit D. These technical issues each constitute material breaches under the terms of the Agreement, or, at a minimum, the aggregate of the myriad issues constitutes a material breach of the Agreement. Agreement, § 4(b)(ii).

Even before that, there were countless instances where Recorded Books notified NetLibrary of performance issues. These issues are detailed in more than 500 pages of e-mails attached to the Second Downing Declaration. *Id.*, Exhibit E. Indeed, the problems with the Iowa

City Public Library alone, which eventually resulted in a shutdown of the NetLibrary system, persisted for over a year, during which Recorded Books and NetLibrary exchanged nearly thirty e-mails discussing the deficiencies. *Id.*, Exhibit F.

NetLibrary never satisfactorily responded to Recorded Books' concerns, as Recorded Books made clear when it notified NetLibrary of a desire to dissolve the relationship. Second Downing Dec. ¶ 8 and Exhibit G. On March 23, 2007, Recorded Books bluntly told NetLibrary that

> Net Library [sic] has ignored RB's requests to improve the product for 18 months. NetLibrary has a poor reputation in the marketplace and we are being dragged down with it. NetLibrary had ample time to fix it. You have to understand that from our perspective the agreement has been breached in several places. . . .

*Id.*, Exhibit G. NetLibrary cannot be heard to complain that it did not receive sufficient notice of its ongoing breaches of the Agreement.[7]

**IV.   The Balance of Hardships Favors the Granting of a Preliminary Injunction.**

As Recorded Book has established a prima facie case of copyright infringement, it is entitled to a presumption of irreparable harm. *See, e.g.*, *Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490, 491 (2d Cir. 2002); *see also NXIVM Corp. v. The Ross Institute*, 364 F.3d 471, 476 (2d Cir. 2004), *cert. denied by* 543 U.S. 1000 (2004); *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 272-74 and n.3 (4th Cir. 2002) (not reaching the question of whether the presumption applies, but noting that, when the presumption is applied, the balance-of-the-hardship question is linked to plaintiff's likelihood of success, and further noting that courts in the Fourth Circuit have applied the presumption to Lanham Act claims).

---

[7]   In order to accommodate libraries and ensure that no party, including NetLibrary, suffered harm, Recorded Books continued to allow libraries to sign up for subscriptions for forty days after the letter that terminated the Agreement. In that time period, NetLibrary still did not correct its deficiencies.

The cases that NetLibrary cites to argue that Record Books is not entitled to this presumption are inapplicable. In *Video Trip Corp. v. Lightning Video, Inc.*, 866 F.2d 50 (2d Cir. 1989), "[t]he real question presented was whether the claimant had ownership." 866 F.2d at 52. Here, there is no such question. The terms of the Agreement explicitly state that Recorded Books maintains ownership of the copyrights and NetLibrary does not dispute otherwise. *See* Agreement, § 9(b). In *Allora, LLC v. Brownstone, Inc.*, Civil No. 1:07CV87, 2007 WL 1246448 (W.D.N.C. Apr. 27, 2007), although the court refused to apply a presumption of irreparable harm, the plaintiff there had failed to establish a prima facie case of copyright infringement, so there was no need to even address the harm issue. *See* 2007 WL 1246448 at *5-7. Here, because Recorded Books lawfully terminated the Agreement, there is no question that NetLibrary's ongoing distribution of Recorded Books' works constitutes infringement. At any rate, the Agreement itself provides for injunctive relief, thereby demonstrating the parties' understanding that irreparable harm would result from material breaches. *See* Agreement, § 8.

Even if the presumption is not applied here, Recorded Books has made a showing of irreparable harm that includes, but also goes well beyond, financial harm. Historically, Recorded Books has only on rare occasions and for very limited purposes used third parties to market, sell, and/or distribute its products to the library market, allowing itself to maintain careful control over the distribution of its copyrighted works as well as its brand. Second Downing Dec. ¶ 10. This decision to retain control has been a significant component of Recorded Books' success. *Id*. NetLibrary's breaches of the Agreement have severely harmed Recorded Books' good reputation, an unacceptable fact that Recorded Books noted to NetLibrary several times. *See* Second Downing Dec. ¶¶ 11 and Exhibit I. Furthermore, the irreparable harm being done to Recorded Books' reputation from its continued association with NetLibrary's sub-par customer

12

service is considerable. As NetLibrary itself notes, NetLibrary is reaching over 1,700 libraries. Response at 2. NetLibrary is damaging Recorded Books's reputation with each one of them. *Cf. Allora*, 2007 WL 1246448 at *6 (finding that the existence of only three infringements did not constitute irreparable harm).

In an effort to minimize the extent of harm it is causing, NetLibrary focuses on the fifteen libraries that Recorded Books mentioned in its opening memorandum. Response at 10. Those fifteen libraries, however, are merely illustrative. They are by no means exhaustive of the many complaints that Recorded Books has received. Indeed, Recorded Books has compiled a more thorough collection of customer complaints that it has received, totaling in excess of 500 pages. Second Downing Dec., Exhibit E. There are doubtless other complaints of which Recorded Books is not aware. Indeed, as it explained in its opening Memorandum, Recorded Books only found out that the Baltimore County libraries were suffering from their problems by conducting its own investigation. Downing Dec. ¶¶ 51-53.

Furthermore, NetLibrary would not be seriously harmed by the entry of a preliminary injunction. Despite its attempt to spin a "David v. Goliath" tale, NetLibrary is a division of OCLC, the "world's largest consortium" of libraries. Second Downing Dec. ¶ 12 and Exhibit J. Far from being a small, vulnerable non-profit corporation, OCLC's annual revenues of nearly a quarter billion dollars far exceed Recorded Books' annual revenues. Second Downing Dec. ¶ 13. NetLibrary's claim that its business is not "established and diversified" is disingenuous. Response at 11. Indeed, the same deals with SOLINET and BCR that violate the Exclusivity Provision allow it to distribute copyrighted works of Recorded Books' competitors to over 3,600 libraries in the United States. Second Downing Dec. ¶¶ 14-15 and Exhibits K and L. Furthermore, even without the Recorded Books content, NetLibrary is still able to distribute to

libraries works from other audiobook publishers, including Random House, the world's largest publisher. Second Downing Dec. ¶ 16 and Exhibits M and N. A preliminary injunction will not upset any of these considerable business relationships. Nor will a preliminary injunction harm the existing subscriptions NetLibrary already has in place under the Agreement. A preliminary injunction will only prevent NetLibrary from making *future* sales under the Agreement. As no one can say what these future sales might be, such harm is clearly "remote and speculative." *Direx Israel, Ltd. v. Breakthrough Med.Corp.*, 952 F.2d 802, 812 (4th Cir. 1991). For the same reasons, the subscribing libraries will not be harmed by the entry of an injunction, and Recorded Books is currently considering other arrangements to offer its content to libraries over the Internet in the future. Second Downing Dec. ¶ 17. Meanwhile, the harm being done to Recorded Books' reputation is actual, ongoing, and irreparable.

      The balance of hardship clearly favors Recorded Books. Recorded Books has made a prima facie case of copyright infringement, unfair competition, and breach of contract as a result of NetLibrary's continued actions in the face of the termination of the Agreement, and as such is entitled to a presumption of irreparable harm. Even without such a presumption, Recorded Books' good reputation is suffering irreparably from Recorded Books' continued association with NetLibrary's unacceptable service beyond what is allowed under the Agreement's wind-down provisions, while neither NetLibrary nor the subscribing libraries will be seriously harmed by the entry of a preliminary injunction.

## **CONCLUSION**

For the foregoing reasons and the reasons set forth in its opening memorandum, Recorded Books respectfully requests that this Court grant its motion for preliminary injunction.

Dated: July 13, 2007

Respectfully submitted,

RECORDED BOOKS, LLC

By its attorneys,

/s/ R. David Hosp
David L. Permut (15111)
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, DC 20001
202.346.4000 (tel.)
202.346.4444 (fax)

-and-

R. David Hosp (admitted *pro hac vice*)
Jaren D. Wilcoxson (admitted *pro hac vice*)
Robert D. Carroll (admitted *pro hac vice*)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
617.570.1000 (tel.)
617.523.1231 (fax)

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on July 13, 2007.

                                                  /s/ R. David Hosp